UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
LUIS FELIPE MORENO-GODOY,                          :

                    Petitioner,      :      13 Civ. 2383 (JSR) (GWG)
                                                07 Cr. 354

              -v.-                        :

                                                REPORT AND
UNITED STATES OF AMERICA,                          :      RECOMMENDATION

                    Respondent.      :
------------------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

       Luis Felipe Moreno-Godoy was convicted by a jury on November 20, 2008, of

conspiracy to kill United States nationals (18 U.S.C. §§ 2332(b), 3238); conspiracy to kill

officers and employees of the United States (18 U.S.C. §§ 1114, 1117, 3238); conspiracy to

acquire and use anti-aircraft missiles (18 U.S.C. §§ 2332g(a)(1), 2332g(b)(4), 3238); conspiracy

to provide material support or resources to designated foreign terrorist organizations (18 U.S.C.

§§ 2339B(a)(1), 2339B(d)(1)(E), 3238); and money laundering (18 U.S.C. § 1956(a)(3)).  On

February 24, 2009, United States District Judge Jed Rakoff sentenced Godoy to 300 months in

prison.  The United States Court of Appeals for the Second Circuit affirmed the judgment of

conviction on October 24, 2011.  Godoy, who is currently in prison serving his sentence, has

petitioned this Court pro se under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence.[1]

---

[1] See Godoy's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence
by a Person in Federal Custody, filed Apr. 9, 2013 (Docket # 1) ("Godoy Pet."); Petitioner's
Attached Legal Memorandum in Support of Request for 28 USC § 2255 Relief, dated Apr. 1,
2013 (annexed to Godoy Pet.) ("Pet. Mem."); Government's Memorandum in Opposition to
Defendant's Motion to Vacate His Sentence Pursuant to 28 U.S.C. § 2255, filed Aug. 20, 2013
(Docket # 164 in 07 Cr. 354) ("Gov't Mem."); Petitioner's Reply to the Government's Response
to 28 U.S.C. § 2255 Petition, filed Oct. 3, 2013 (Docket # 11) ("Godoy Reply").

For the reasons stated below, Godoy's petition should be denied.

I.  BACKGROUND

      A.     Proceedings in the Criminal Case

           1.     Godoy's Indictment, Arrest, and Extradition

Godoy and co-conspirators Monzer Al Kassar and Tareq Mousa Al Ghazi were indicted for the following offenses: (1) conspiracy to kill United States nationals in violation of 18 U.S.C. §§ 2332(b), 3238; (2) conspiracy to kill officers and employees of the United States in violation of 18 U.S.C. §§ 1114, 1117, 3238; (3) conspiracy to acquire and use anti-aircraft missiles in violation of 18 U.S.C. §§ 2332g(a)(1), 2332g(b)(4), 3238; (4) conspiracy to provide material support or resources to a foreign terrorist organization in violation of 18 U.S.C. §§ 2339B(a)(1), 2339B(d)(1)(E), 3238; and (5) money laundering in violation of 18 U.S.C. § 1956(a)(3).  See Third Superseding Indictment, filed June 21, 2007 (Docket # 7 in 07 Cr. 354) ("Indictment").  In a section called "Background to the Conspiracy," the Indictment alleged:

> Since in or about the early 1970s [Kassar] has been an international weapons trafficker [who] has been a source of weapons and military equipment for armed factions engaged in violent conflicts around the world [including] such factions in Nicaragua, Brazil, Cyprus, Bosnia, Croatia, Somalia, Iran, and Iraq. . . . Luis Felipe Moreno Godoy, the defendant, has worked with [Kassar] in his weapons-trafficking business for approximately the last 10 years [and] [d]uring this time period, [Godoy's] role has included managing financial matters for Al Kassar, including arranging for various bank accounts to be used to conduct weapons transactions.

Id. at 1, 3.

The Indictment alleged that Godoy, Kassar, and Ghazi had agreed to provide the international terrorist group Fuerzas Armadas Revolucionarias de Colombia ("FARC") with "millions of dollars worth of weapons to be used, among other things, to kill nationals of the United States in Colombia."  See id. at 5.  The indictment contained details of a Government

sting operation beginning in February 2007 in which "[Kassar] and [Ghazi] met with two confidential sources working with the United States Drug Enforcement Agency (the 'DEA') at [Kassar's] residence in Marbella, Spain, and discussed the sale of millions of dollars worth of weapons to the FARC." Id. at 6.  The confidential sources told Kassar and Ghazi that "they represented the FARC, and that the FARC needed weapons to fight against the United States in Colombia," to which Kassar allegedly replied that "his fight was also with the United States, and agreed to sell weapons to the FARC." Id.  Kassar "offered to send 1,000 men to the [confidential sources] to fight with the FARC against United States military officers in Colombia, and also offered to supply the [confidential sources] with C4 explosives, detonators, and experts to train the FARC to use them against these United States armed forces." Id. at 7-8.

According to the indictment, on March 27, 2007, Kassar, Godoy, and Ghazi met with the confidential informants to further discuss the sale of the weapons and also to discuss the sale of "surface-to-air missile systems for the FARC to use to attack United States helicopters in Colombia." Id. at 10.  Also on that day, Godoy allegedly "transported the [confidential sources] to an Internet café to permit [them] to transfer €100,000 from the United States . . . to secure . . . transportation services for the weapons." Id. at 11.  On April 5, 2007, Kassar and Godoy allegedly "received an email that had been drafted by [the confidential source] that asked [Kassar] and [Godoy] . . . to obtain 15 of the surface-to-air missile systems [Kassar] had previously shown to the [confidential sources]," and Kassar then called the confidential source on the telephone and "agreed to provide [him] with the surface-to-air missile systems [that he] had requested." Id. at 12-13.  On May 2, 2007, Kassar and Godoy allegedly met with one of the confidential sources "and discussed the logistics of transporting the weapons." Id. at 13.  On May 19, 2007, Kassar agreed to meet with the confidential source in Romania as soon as the

3

confidential source had access to €3,500,000 to pay for the weapons.  Id. at 16.

On June 7, 2007, United States Drug Enforcement Administration ("DEA") agents obtained a provisional arrest warrant and arrested Godoy in Bucharest, Romania.  See Trial Transcripts, filed Dec. 3, 2008 (Docket ## 101, 102, 103, 168 in 07 Cr. 354) ("Tr."), 378-80.  In July 2007, the Government submitted affidavits to the court in support of Godoy's extradition from Romania.  See Affidavits in Support of Request for Extradition (annexed as Ex. 4 to Godoy Pet.).  Collectively, these affidavits recounted the factual details regarding the FARC weapons agreement, explained the charges brought against Godoy in the Indictment, and summarized evidence that the Government had obtained in support of these charges.  On October 16, 2007, the Romanian government agreed to extradite Godoy and delivered him into the custody of United States DEA personnel.  See DEA Report of Investigation, dated Oct. 30, 2007 (annexed as Ex. 7 to Godoy Pet.).  Godoy was then brought to the United States and placed in the Special Housing Unit ("SHU") of the Metropolitan Correctional Center ("MCC") in New York City. See  Letter from Roger Stavis to MCC, dated Feb. 19, 2008 (annexed as Ex. 9 to Godoy Pet.) ("Stavis MCC Letter").  On October 18, 2007, Godoy was arraigned on the Indictment.  See Minute Entry for Proceedings Held Before Judge Jed S. Rakoff, dated Oct. 18, 2007 (Docket for 07 Cr. 354).

### 2.    _Curcio_ Hearing Regarding Stavis

At the time of his arraignment, Godoy was represented by Jennifer Brown of the Federal Defenders.  See id.  On January 7, 2008, Godoy signed a stipulation for substitution of counsel which appointed Roger Stavis as his new attorney.  See Stipulation for Substitution of Counsel, filed Jan. 10, 2008 (Docket # 19 in 07 Cr. 354).  On April 10, 2008, Judge Rakoff held a hearing pursuant to United States v. Curcio, 680 F.2d 881 (2d Cir. 1982), to determine if there was a

conflict of interest with Stavis representing Godoy, and if so, whether Godoy wished to waive the conflict. See Transcript of Proceedings Held Before Judge Jed S. Rakoff, dated Apr. 10, 2008 (annexed as Ex. B to Gov't Mem.) ("C. Hr."). At the hearing, Stavis testified that Godoy's co-defendant, Kassar, had paid him to represent Godoy throughout the criminal proceedings. See C. Hr. 21. Stavis stated that he told this to Godoy, and Godoy "was very pleased about that" because he "would not have to pay [any] fees." Id. Stavis further explained that he did not think that it "matter[ed] that Mr. Al Kassar or people associated with him were responsible for the fees [because Stavis's] loyalty would only run to [Godoy] and [he] wouldn't do anything to damage him in order to please Mr. Al Kassar." C. Hr. 21-22. Additionally, Stavis stated he would have no financial incentive to please Kassar because his fees had already been "fully paid" by Kassar, and therefore, Kassar had "no further financial obligation toward [him] whatsoever." C. Hr. 22. Godoy then testified that he remembered having such conversations with Stavis. C. Hr. 23. Judge Rakoff explained to Godoy the possibility that he would have to take an adverse position to Kassar at trial and asked Godoy whether he would still be comfortable with Stavis representing him in such a situation. C. Hr. 24. Godoy replied that he would still be "[c]ompletely satisfied" and that he had no questions in his mind about Stavis's loyalty. Id. Based on Stavis and Godoy's testimony, Judge Rakoff concluded, "I am totally satisfied that there is neither an actual nor even a potential conflict and that [Godoy] fully understands the entire situation and recognizes that, if there were even the slightest conflict, they should bring it to the attention of the Court; and that they are totally comfortable with their current counsel and feel no need and have expressed no need to consult with separate counsel." C. Hr. 26. Judge Rakoff then acknowledged the fact that "the entire funding [of Godoy's representation] was taken up front, so to speak. So that there is no moneys that will be coming directly or indirectly

5

from Mr. Al Kassar to [Stavis] in the future," and therefore, "there is no economic disincentive to [Godoy or Stavis] taking any position adverse to Mr. Al Kassar." Id.

Finally, Judge Rakoff informed Godoy that "should at any future time [he have] misgivings in this area that have not come out for some reason or that develop as a result of future activity, [he is] to personally bring them directly to the attention of the Court so that the Court can inquire further at such a time." C. Hr. 26-27. Godoy has not alleged in his § 2255 petition that he ever raised any concerns about this issue to Judge Rakoff at any time before or during trial.

### 3.      The Motion to Dismiss the Indictment

On April 1, 2008, Godoy, together with co-defendants Kassar and Ghazi, made a motion to dismiss the indictment. See Notice of Motion, filed Apr. 1, 2008 (Docket # 27 in 07 Cr. 354) ("Mot. Dismiss Ind."); Memorandum of Law in Support of Motion to Dismiss the Indictment and Other Relief, filed Apr. 1, 2008 (Docket # 28 in 07 Cr. 354). Among other requests, the motion asked the Court to grant the following relief: "(1) to dismiss the Indictment because the Government violated their rights under the Due Process Clause during the investigation, or, alternatively, to require the Court to conduct an evidentiary hearing on the issue; (2) to dismiss Counts One and Three for factual insufficiency and because the factual allegations of Count Three fit within the excluded conduct provision of 18 U.S.C. § 2332g ; (3) to dismiss Count Two because 18 U.S.C. § 1114, which criminalizes the murder of U.S. officers or employees, should not be applied extraterritorially; (4) to dismiss Count Four because 18 U.S.C. § 2339B violates the Due Process Clause; [and] (5) to remove purported surplusage from the Indictment." See Government's Memorandum in Opposition to Defendants' Motion to Dismiss and for Other Relief, filed May 5, 2008 (Docket # 31). Judge Rakoff denied the motion. See Order, filed Sept.

6

9, 2008 (Docket # 77 in 07 Cr. 354); see also United States v. Al Kassar, 582 F. Supp. 2d 488

(S.D.N.Y. 2008).

        4.    Godoy's Trial and Sentencing

     A joint trial for Godoy and Kassar was held from November 3 to November 20, 2008.

Ghazi was tried separately.  See Order, filed Oct. 27, 2008 (Docket # 89 in 07 Cr. 354).

The evidence at trial was summarized by the Second Circuit as follows:

> In 2005, the Drug Enforcement Administration ("DEA") set up a sting operation to apprehend [Monzer al Kassar, a Spanish national and resident] for selling arms illegally.
>
> To this end, the DEA sent Samir Houchaimi, a confidential informant, to locate Tareq Mousa al Ghazi, a known associate of al Kassar, and set up a meeting with al Kassar. Houchaimi went to Lebanon, where al Ghazi lived, and won his trust over several months. Houchaimi told al Ghazi that he was in the weapons trade, asked to meet with al Kassar, and gave al Ghazi a fake end-user certificate [an official government document required to conduct a legal international weapons sale] for Nicaragua supplied by the DEA. Houchaimi asked al Ghazi to arrange a meeting with al Kassar, and al Ghazi agreed.
>
> Al Kassar arrived at the arranged meeting in Beirut holding the end-user certificate Houchaimi had given to al Ghazi. The meeting was fruitful, ending with al Kassar inviting Houchaimi to his mansion in Spain to further discuss the Nicaraguan arms deal.
>
> At the meeting in Spain (in February 2007), Houchaimi introduced al Kassar to "Carlos" and "Luis" — two undercover DEA agents posing as members of FARC (a left-wing Colombian terrorist organization) — and al Kassar introduced his associate, Luis Felipe Moreno Godoy. The DEA agents told al Kassar they were interested in buying weapons for FARC's use against the U.S. military in Colombia. They gave al Kassar a list of weapons they wanted, which included anti-aircraft missiles ("SAMs"). Al Kassar agreed to negotiate.
>
> Over the next several months, in the presence of Godoy and al Ghazi, al Kassar negotiated an arms deal with the two DEA agents. The negotiators discussed at length FARC's intent to use the weapons against Americans and U.S. assets. When al Kassar left the room during a break in negotiations, al Ghazi advised the DEA agents how to negotiate effectively with al Kassar. At the end of March, 2007, when the parties had agreed to basic terms (including the sale of SAMs), Godoy took the DEA agents to an Internet café and helped them transfer

a down payment (€ 100,000) to a bank account controlled by al Kassar.

      The next day (after confirming receipt of the down payment), al Kassar again met with the DEA agents to discuss details. Before the meeting, al Ghazi again counseled the DEA agents on how best to secure the sale. At the meeting — again in the presence of Godoy and al Ghazi — al Kassar gave the DEA agents schematics for the SAMs he was selling and explained how he planned to smuggle the weapons into Colombia through a cargo ship destined for Suriname (with al Kassar, as usual, translating for al Ghazi).

      In May 2007, al Kassar and Godoy facilitated a meeting between the DEA agents and the captain of the ship that would smuggle the weapons. Before the meeting, the DEA agents wired another payment ($135,000) to a bank account controlled by al Kassar. Afterward, al Kassar and Godoy visited arms factories in Bulgaria and Romania to secure the weapons.

      In June 2007, the DEA agents agreed to meet al Kassar and Godoy in Bucharest to make final payment. Al Kassar stayed in Spain, however, and sent Godoy and al Ghazi to pick up the money. Pursuant to valid arrest warrants and in coordination with the DEA, Romanian authorities arrested al Ghazi and Godoy in Bucharest. The same day, Spanish authorities arrested al Kassar at the Madrid International Airport; he was carrying fake end-user certificates for the FARC weapons and documents confirming final arrangements to ship the weapons from Romania to Suriname. A search of al Kassar's mansion yielded documents establishing his and Godoy's participation in other arms deals and confirming that al Kassar controlled the bank accounts into which the DEA agents had wired money.

      Godoy and al Ghazi were extradited here from Romania in October 2007. During the flight, al Ghazi agreed to waive his Miranda rights and admitted to the DEA agents that: (1) he knew al Kassar was selling weapons, including SAMs, to FARC; (2) he knew that FARC was a terrorist organization, which planned to use the weapons to kill Americans; and (3) he facilitated the deal because he was promised a € 125,000 commission.

United States v. Al Kassar, 660 F.3d 108, 115-116 (2d Cir. 2011) (footnotes omitted).

      Among the witnesses at trial were DEA Agent John Archer, who testified about his role in orchestrating the sting operation, Tr. 331-617, and the two confidential informants, Carlos and Samir, who testified about their interactions with the defendants during the operation, Tr. 620-958, 972-1086.  Additionally, the Government presented "hours of undercover video and audio

recordings made by the DEA informants during which all three defendants discussed the details

of the proposed weapons deal and agreed to provide the requested weapons" and "physical

evidence, primarily documents — including those provided by al Kassar to the informants to

advance the weapons deal, those al Kassar had in his briefcase at the time of his arrest, and those

found during the court-authorized search of al Kassar's mansion." See Brief for the United

States of America Opposing the Appeal of Monzer Al Kassar, Luis Felipe Moreno Godoy, and

Tareq Mousa Al Ghazi (2d Cir. filed Nov. 30, 2010) (No. 09-1051 ), at 25.

Defense counsel argued to the jury that Kassar and Godoy lacked the required intent to

enter into the conspiracy because they were in fact working with Spanish authorities and had

planned to turn in the informants for engaging in illegal activity. Tr. 298-308. In support of this

defense, they provided video testimony from two Spanish officials, Chief Inspector Jose

Villarejo and Commissioner Enrique Castano. Tr. 1357-59. On November 20, 2008, the jury

returned a verdict convicting both Godoy and Kassar of all five counts in the indictment. See

Jury Verdict, dated Nov. 20, 2008 (Docket for 07 Cr. 354). On February 24, 2009, Judge Rakoff

sentenced Godoy to 300 months imprisonment on counts one, two, and three and to lesser

sentences on counts four and five. See Judgment, filed Mar. 11, 2009 (Docket # 120 in 07 Cr.

354). All sentences were to run concurrently. Id.

B.    Direct Appeal

Godoy, Kassar, and Ghazi filed a joint appeal raising the following arguments:

[I] The government lacked jurisdiction to prosecute because of an insufficient nexus
between their actions and the United States.
[II] The government's investigation constituted "outrageous conduct" in violation of their
due process rights.
[III] The district court erred in denying their motion to introduce exculpatory classified
evidence.
[IV] The convictions under 18 U.S.C. § 2332g (acquiring and exporting SAMs) must be

9

overturned because: the statute does not criminalize conspiracy; the jury was improperly instructed as to scienter; the defendants' actions fall under the statute's exception for authorized conduct; and there was insufficient evidence of conspiracy.
[V] The convictions under 18 U.S.C. § 2339B (aiding a known terrorist organization) must be overturned because: the statute requires that the aid be intended to support the illegal activities of the terrorist organization, or, in the alternative, the statute violates the Fifth Amendment's Due Process Clause by not requiring such intent.

Al Kassar, 660 F.3d at 117.  On September 21, 2011, the Second Circuit rejected all of these claims and affirmed the convictions of the three defendants.  See id.  Godoy filed a petition for certiorari in the United States Supreme Court, but his petition was denied on May 14, 2012.  See Godoy Pet. at 3.

     C.    The Instant Motion

Godoy filed the instant motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 on April 9, 2013.  See Godoy Pet.  In the petition, Godoy asserts multiple grounds for relief, including ineffective assistance of counsel claims, a claim that he was denied conflict-free representation in violation of his Sixth Amendment rights, and several other claims unrelated to his counsel's performance.  See id. at 5-9.  The Government filed a response to Godoy's petition on August 20, 2013, see Gov't Mem, and Godoy filed a reply brief on October 3, 2013, see Godoy Reply.[2]

---

[2] On October 3, 2013, Godoy filed a motion to expand the record to include additional evidence attached to his reply brief.  See Petitioner's Motion to Expand the Record to Include Additional Evidence Pursuant to § 2255 Rule 7(a), filed Oct. 3, 2013 (Docket # 12).  In an Order issued today, we granted this motion.  Thus, we have considered this additional evidence in deciding Godoy's petition.

II.      LAW GOVERNING REVIEW OF SECTION 2255 PETITIONS

Section 2255(a) of Title 28 of the United States Code provides that

> [a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

Relief under this statute is available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in [a] complete miscarriage of justice." Graziano v. United States, 83 F.3d 587, 590 (2d Cir. 1996) (citation and internal quotation marks omitted). "Because collateral challenges are in tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack." Yick Man Mui v. United States, 614 F.3d 50, 53 (2d Cir. 2010) (internal quotation marks and citation omitted).

In considering a § 2255 petition, "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255(b). On the other hand, "if it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion." Puglisi v. United States, 586 F.3d 209, 213 (2d Cir. 2009) (internal quotation marks, alteration and citations omitted).

Case law reflects that a hearing is required in § 2255 cases "where the petitioner has made a plausible claim." Morales v. United States, 635 F.3d 39, 45 (2d Cir. 2011) (addressing

ineffective assistance of counsel claims) (citing Puglisi, 586 F.3d at 213) (quotation marks omitted). To warrant a hearing, a petitioner's "application must contain assertions of fact that [the] petitioner is in a position to establish by competent evidence." United States v. Aiello, 814 F.2d 109, 113 (2d Cir. 1987); see also LoCascio v. United States, 395 F.3d 51, 57 (2d Cir. 2005) ("[M]ere generalities or hearsay statements will not normally entitle the applicant to a hearing, since such hearsay would be inadmissible at the hearing itself.") (internal quotation marks, punctuation, and citations omitted). The court must determine whether, viewing the record "in the light most favorable to the petitioner, the petitioner, who has the burden, may be able to establish at a hearing a prima facie case for relief." Puglisi, 586 F.3d at 213. If any material facts are in dispute and a petitioner can identify the available sources of the relevant evidence, a petitioner's claims will warrant a hearing. See id. at 213-14 (noting that "a petitioner may need only to identify available sources of relevant evidence rather than obtain it as in civil cases"). Nonetheless, "[a]iry generalities, conclusory assertions and hearsay statements will not suffice because none of these would be admissible evidence at a hearing." Aiello, 814 F.2d at 113-14. Furthermore, the Court is not required to presume the credibility of factual assertions "where the assertions are contradicted by the record in the underlying proceeding." Puglisi, 586 F.3d at 214.

However, even when a hearing is required, "'the statute itself recognizes that there are times when allegations of facts outside the record can be fully investigated without requiring the personal presence of the prisoner.'" Chang v. United States, 250 F.3d 79, 85 (2d Cir. 2001) (quoting Machibroda v. United States, 368 U.S. 487, 495 (1962)); see 28 U.S.C. § 2255(c) ("A court may entertain and determine such motion without requiring the production of the prisoner at the hearing."). Depending on the allegations in the petition, a "court may use methods under Section 2255 to expand the record without conducting a full-blown testimonial hearing." Chang,

12

250 F.3d at 86 (citing Blackledge v. Allison, 431 U.S. 63, 81-82 (1977)).  Potential methods available to a court to supplement the record include "'letters, documentary evidence, and, in an appropriate case, even affidavits.'"  Id. (quoting Raines v. United States, 423 F.2d 526, 529-30 (4th Cir. 1970) (footnote omitted)); accord Pham v. United States, 317 F.3d 178, 184 (2d Cir. 2003) (the Second Circuit "permits a middle road of deciding disputed facts on the basis of written submissions") (internal quotation marks and citation omitted).

A full testimonial hearing should be conducted if it would "offer any reasonable chance of altering [the court's] view of the facts."  See Chang, 250 F.3d at 86.  A petitioner's statement is "sufficiently credible to warrant a hearing where it is accompanied by some 'objective evidence.'"  Puglisi, 586 F.3d at 216 (citation omitted).  Nonetheless, "[t]o obtain an evidentiary hearing, Petitioner must . . . set forth in an affidavit specific facts supported by competent evidence, raising detailed and controverted issues of fact which, if proved at a hearing, would entitle him to relief."  Boakye v. United States, 2010 WL 1645055, at *6 (S.D.N.Y. Apr. 22, 2010) (citations omitted); accord Petrucelli v. United States, 2009 WL 4858081, at *13 n.1 (S.D.N.Y. Dec. 15, 2009) ("To warrant an evidentiary hearing, a habeas petitioner must raise detailed and controverted issues of fact supported by competent evidence.").  A testimonial hearing need not take place if it would not succeed in providing additional material facts.  See, e.g., Ortega v. United States, 2012 WL 2478277, at *8 (S.D.N.Y. June 27, 2012); accord Fermin v. United States, 859 F. Supp. 2d 590, 602 (S.D.N.Y. 2012) (petitioner's "failure to provide specific facts about any conversations to support his claim suggests that a testimonial hearing would do nothing to reveal such facts").

III.    DISCUSSION

Godoy's habeas petition makes multiple claims raising ineffective assistance of counsel.

13

Godoy alleges that during the pre-trial proceedings Stavis provided ineffective assistance of counsel by: (1) failing to move for dismissal of the indictment on double jeopardy grounds; (2) failing to move for dismissal of the indictment on grounds that it was motivated by vindictiveness and malice; (3) failing to move for dismissal of count three of the indictment (charging Godoy with conspiracy to acquire and use anti-aircraft missiles) on sentencing manipulation/entrapment grounds; (4) failing to move for severance of Godoy's trial from Kassar's; and (5) stipulating that Godoy knew that FARC was a designated terrorist organization.  See Pet. Mem. at 37-78.

Godoy alleges that Stavis provided ineffective assistance at the trial stage by: (1) failing to move to exclude from evidence the Government's recorded conversations; (2) failing to hire a weapons system and defense technology expert to provide "crucial" testimony for Godoy's defense; (3) failing to have Godoy take the stand in his own defense; (4) failing to call DEA Agent James Soiles to testify at Godoy's trial; and (5) failing to adequately cross-examine and impeach the Government's "key" witnesses at trial.  See id. at 78-134.

Godoy alleges that during post-trial proceedings Stavis provided ineffective assistance of counsel by: (1) failing to raise the "right" extraterritorial jurisdiction argument on appeal; (2) failing to allow Godoy to hire a new attorney to handle his case on appeal; and (3) failing to argue on appeal that Godoy was not in fact a knowing participant in Kassar's conspiracy.  See id. at 134-47.  Additionally, Godoy argues that the cumulative impact of all of these shortcomings deprived him of effective assistance of counsel.  See id. at 152-54.

Godoy also alleges that his Sixth Amendment right to conflict-free representation was violated because "Al Kassar's family paid all of the legal expenses and for that reason [Stavis's] loyalties were for Al Kassar first and Moreno-Godoy second."  See 147-52.  Finally, Godoy

14

raises four claims in support of his petition unrelated to his counsel.

A.      Ineffective Assistance of Counsel Claims

"In order to prove ineffective assistance, [a petitioner] must show (1) 'that counsel's representation fell below an objective standard of reasonableness'; and (2) 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  Pham, 317 F.3d at 182 (quoting Strickland v. Washington, 466 U.S. 668, 688, 694 (1984)); accord United States v. Brown, 623 F.3d 104, 112 (2d Cir. 2010); see also Massaro v. United States, 538 U.S. 500, 505 (2003) ("[A] defendant claiming ineffective counsel must show that counsel's actions were not supported by a reasonable strategy and that the error was prejudicial.").  In evaluating the first prong – whether counsel's performance fell below an objective standard of reasonableness – "'[j]udicial scrutiny . . . must be highly deferential,'" and the petitioner must overcome the "'presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'"  Bell v. Cone, 535 U.S. 685, 698 (2002) (quoting Strickland, 466 U.S. at 689) (alteration in original); see Dunham v. Travis, 313 F.3d 724, 730 (2d Cir. 2002) (according counsel a presumption of competence).

To satisfy the prejudice requirement, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Strickland, 466 U.S. at 694; accord Lynn v. Bliden, 443 F.3d 238, 247-48 (2d Cir. 2006).  Concerning the second prong — whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different — the Second Circuit generally "requires some objective evidence other than defendant's assertions to

15

establish prejudice." Pham, 317 F.3d at 182 (citing United States v. Gordon, 156 F.3d 376, 380-81 (2d Cir. 1998) (per curiam)).

>    1.    Failure to Raise Certain Arguments in Motion to Dismiss the Indictment

Godoy asserts that Stavis provided ineffective assistance of counsel at the pre-trial stage because in the motion to dismiss the indictment, see Mot. Dismiss Ind., Stavis failed to present several arguments

a.  Double Jeopardy.  Godoy claims that Stavis should have argued that counts one and two of the indictment, charging Godoy respectively with conspiracy to kill United States nationals in violation of 18 U.S.C. §§ 2332(b), 3238 and conspiracy to kill officers and employees of the United States in violation of 18 U.S.C. §§ 1114, 1117, 3238, violated the double jeopardy clause of the Fifth Amendment because these charges "relied on the same exact factual predicate to establish proof of conviction."  See Pet. Mem. at 38.  Godoy contends that Stavis's failure to raise this claim is analogous to the case of Jackson v. Leonardo, 162 F.3d 81 (2d Cir. 1988), which found that "counsel's failure to raise a well-established, straightforward, and obvious double jeopardy claim constitute[d] ineffective performance."  Id. at 85

This claim is rejected because there was no double jeopardy issue to be raised.  The law governing double jeopardy challenges has been summarized by the Second Circuit as follows:

> The Double Jeopardy Clause of the Fifth Amendment states that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb," U.S. Const. amend. V, and prohibits multiple punishments for the same offense. "[T]he standard for analyzing whether offenses are the same in law is the same-elements test established in Blockburger v. United States, [284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932) ]," United States v. Basciano, 599 F.3d 184, 196–97 (2d Cir.2010), which is "a rule for divining congressional intent," Lewis v. United States, 523 U.S. 155, 182, 118 S.Ct. 1135, 140 L.Ed.2d 271 (1998), citing Missouri v. Hunter, 459 U.S. 359, 366–67, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983). The Blockburger inquiry "asks whether 'each offense contains an element not contained in the other,' and provides that, if not, 'they are the same offence and double jeopardy bars additional punishment and successive

16

prosecution.' " Basciano, 599 F.3d at 197, quoting United States v. Dixon, 509 U.S. 688, 696, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993). "[I]f each section requires proof of at least one fact that the other does not, there are two offenses, and it is presumed that the legislature intended to authorize prosecution and punishment under both. In that circumstance, the imposition of multiple punishments does not violate the Double Jeopardy Clause." United States v. Khalil, 214 F.3d 111, 118 (2d Cir.2000).

United States v. Weingarten, 713 F.3d 704, 708 (2d Cir. 2013). The two charges Godoy cites each "require[d] proof of at least one fact that the other [did] not." Id. (quoting Khalil, 214 F.3d at 118). Count One of the indictment charged Godoy with conspiracy to kill United States nationals, see Indictment at 1-19, which required proof that Godoy "outside the United States attempt[ed] to kill, or engage[d] in a conspiracy to kill, a national of the United States," 18 U.S.C. § 2332(b). Count Two of the Indictment charged Godoy with conspiracy to kill officers and employees of the United States, see Indictment at 19-21, which required proof that Godoy conspired to "kill or attempt[ ] to kill any officer or employee of the United States . . . while such officer or employee is engaged in or on account of the performance of official duties, or any person assisting such an officer or employee in the performance of such duties or on account of that assistance," 18 U.S.C. § 1114. While these offenses share some common elements, they each require proof of a fact that the other does not. Specifically, the crime charged in Count One required the Government to prove at trial that Godoy conspired to kill a United States national while "outside the United States," 18 U.S.C. § 2332(b), while the crime charged in Count Two had no such territorial requirement. Additionally, the crime charged in Count Two required the Government prove that the person who Godoy conspired to kill was an "officer or employee of the United States . . . or any person assisting such an officer," 18 U.S.C. § 1114, while Count

One only required that the intended target be a United States national.[3]

Because Count One and Two each required proof of an element that the other did not, there was no violation of the double jeopardy clause when Godoy was charged, convicted, and sentenced for these offenses.  See Weingarten, 713 F.3d at 708.  Accordingly, Stavis's decision not to raise this issue cannot be said to constitute ineffective assistance of counsel.  See United States v. Kirsh, 54 F.3d 1062, 1071 (2d Cir. 1995) ("[T]he failure to make a meritless argument does not rise to the level of ineffective assistance.") (citation omitted); accord Davis v. United States, 636 F. Supp. 2d 297, 299 (S.D.N.Y. 2009) ("Failure to raise irrelevant or otherwise meritless arguments cannot support [an ineffective assistance] claim.") (citation omitted).

b.  Vindictive Prosecution.  Godoy argues that Stavis should have moved to dismiss the indictment on the grounds that Godoy's arrest and prosecution were "clearly the product of an unlawfully vindictive and malicious motive."  Pet. Mem. at 43.  In support of this claim, Godoy paints the Government's sting operation as a "Witch Hunt," id. at 45, alleging that "the Government brought the Indictment forward with malice and vengeance [against Kassar] based upon things that, although not formally charged, it believed Al Kassar was and is responsible for," id. at 46.  Thus, because "the Government's Sting Operation against Al Kassar was retaliation for his open views about the American Government, and revenge for selling weapons

---

[3]  In fact, these distinctions were highlighted by Judge Rakoff at Godoy's trial when he gave the following jury instructions:

> The chief difference between Count One and Count Two is that Count One involves an agreement made outside of the United States to murder United States citizens, while Count Two involves an agreement, whether made in the United States or outside, to murder persons who, whether United States citizens or otherwise, were officers or employees of the United States engaged in the performance of their official duties.

Tr. 1522.

to their enemies," Stavis was ineffective for failing to move to dismiss the indictment on grounds that it was "the product of a vindictive and malicious motive in violation of the Fifth Amendment." Id. at 51-52.

An indictment can be dismissed for "actual vindictiveness," if the defendant can show that "(1) the prosecutor harbored genuine animus toward the defendant, or was prevailed upon to bring the charges by another with animus such that the prosecutor could be considered a 'stalking horse,' and (2) the defendant would not have been prosecuted except for the animus." United States v. Bout, 731 F.3d 233, 238 (2d Cir. 2013) (quoting United States v. Sanders, 211 F.3d 711, 717 (2d Cir. 2000)) (emphasis removed).  As the Second Circuit has noted, the "animus" necessary to prove vindictive prosecution typically occurs when "a prosecutor's charging decision is a direct and unjustifiable penalty that resulted solely from the defendant's exercise of a protected legal right."  Id. at 239 (citation and internal quotation marks omitted) (emphasis added).  Thus, "[t]he government's enthusiastic or energetic pursuit of [a] high-priority criminal target, does not demonstrate vindictive, or even inappropriate, government conduct."  Id. (citation omitted).[4]

Godoy's claim is rejected because the allegations supporting his argument are completely lacking in any evidentiary basis.  Instead, they consist solely of supposition posited by Godoy in the course of his memoranda of law.  Given the lack of any factual basis to make the motion Godoy proposes, Stavis cannot be faulted for not attempting to move to dismiss on the ground that the prosecution was motivated by a desire to penalize Godoy for exercising a protected legal

---

[4]  Godoy's claim does not raise an issue of "presumed prosecutorial vindictiveness," which "only applies when a prosecutor lodges additional charges after a trial."  United States v. Rooney, 866 F.2d 28, 33 (2d Cir. 1989).

right.  Notably, Godoy is himself inconsistent in his claims as to the Government's motives.

Godoy complains that (1) DEA agent James Soiles improperly pressured the Government to

engage in the sting operation because he wanted to get revenge against Kassar after Kassar was

acquitted of hijacking charges in a prior criminal proceeding in Spain, see Pet. Mem. at 47-49;

and (2) that the Government prosecuted Kassar and Godoy because it "'suspected' that [Kassar]

had sold weapons to their enemies in the past," Pet. Mem. at 50-55.  Thus, even accepting

Godoy's contentions as true, Stavis could not have successfully shown that the Government's

decision to prosecute was "solely" motivated by Kassar and Godoy's exercise of protected

rights.  See United States v. Stewart, 590 F.3d 93, 123 (2d Cir. 2009) (Actual vindictiveness

requires that the "prosecutor's charging decision [is] a direct and unjustifiable penalty, that

resulted solely from the defendant's exercise of a protected legal right") (citation and internal

quotation marks omitted) (alteration in original).

     c.  Sentencing Manipulation/Entrapment.  In a related argument, Godoy contends that

Stavis should have moved to dismiss the missile count in the indictment on grounds that the

United States Government "engaged in Sentencing Manipulation/Entrapment in violation of the

Fifth Amendments [sic] Due process Clause when it interjected the request to buy Missiles [at

the end of the Sting] just so they could be sure that both the Defendant's [sic] receive at least the

25-year mandatory minimum for the Missile Count."  Id. at 53 (emphasis removed).  Godoy

further asserts that "Defendant's [sic] were not predisposed to sell Missiles" and that "the

Government Informants persisted, bringing up their Missile Request on several occasions until

Al Kassar finally got sick of them asking."  Id. at 55.  Assuming arguendo that Godoy's

characterization of the facts is correct, he still has not shown that Stavis acted unreasonably in

declining to raise a sentencing manipulation/entrapment argument in the motion to dismiss the

20

indictment.  As the Government correctly points out, see Gov't Mem. at 27, and as even Godoy

seems to admit, see Pet. Mem. at 52, the Second Circuit has not yet recognized the doctrine of

sentencing manipulation, see United States v. Gagliardi, 506 F.3d 140, 148 (2d Cir. 2007)

("[T]his Court has not yet recognized the doctrine of sentencing manipulation . . . .") (citing

United States v. Gomez, 103 F.3d 249, 256 (2d Cir. 1997)).  Given the doctrine's unrecognized

status, it cannot be said that Stavis was objectively unreasonable or caused Godoy any prejudice

for failing to raise this argument in the motion to dismiss the indictment.  Cf. United States v.

Lian, 391 F. App'x 969, 972 (2d Cir. 2010) (finding no grounds for ineffective assistance of

counsel claim premised on failure to argue sentencing manipulation because sentencing

manipulation remains unrecognized in the Second Circuit).[5]  To the extent that Godoy is arguing

there should have been a motion to dismiss the indictment based on entrapment, he has presented

no evidence suggesting that he could have met his burden to show that "(1) the government by

its conduct induced the commission of the crime for which the defendant is being prosecuted,

and (2) the defendant lacked the predisposition to engage in such criminal conduct."  United

States v. Damblu, 134 F.3d 490, 495 (2d Cir. 1998); see generally Mathews v. United States, 485

U.S. 58, 63 (1988) ("The question of entrapment is generally one for the jury, rather than for the

court.").

2.      Failure to Move for Severance of Godoy's Trial

Godoy argues that Stavis should have moved for severance of Godoy's trial from

---

[5] In any event, the Government's sting operation lacked the "outrageous government
conduct" necessary to prove sentencing manipulation.  See Gomez, 103 F.3d at 256.  Indeed,
when Godoy appealed his conviction, the Second Circuit concluded that "[w]hile the sting
operation in this case was elaborate and prolonged, there was no coercion or physical force, and
nothing done was outrageous or a shock to the conscience."  Al Kassar, 660 F.3d at 122.

Kassar's because: "(1) the defenses were mutually antagonistic [sic]; (2) exculpatory evidence such as Al Kassar's and Moreno-Godoy's testimony was not admitted because of the joint trial; (3) an abundance of prejudicial evidence was admitted against Al Kassar that would not have been admissable [sic] against Moreno-Godoy had they been tried separately; (4) the joint trial violated Moreno-Godoy's Sixth Amendment Confrontation Rights pursuant to Bruton; and (5) the joint Trial prevented the jury from making a reliable judgment about guilt or innocence." Pet. Mem. at 58-59.  Thus, in Godoy's view, Stavis was ineffective for not anticipating these consequences of having a joint trial and for failing to move for severance.  See id. at 72.

To determine the merit of Godoy's claim that Stavis should have moved for severance, we first examine when severance is appropriate.  The Second Circuit has explained the law governing joint criminal trials and severance as follows:

> [Federal Rule of Criminal Procedure] 8(b) provides for joinder of defendants "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." . . . When defendants are properly joined under Rule 8, a severance, pursuant to Fed R.Crim. P. 14, should only be granted if there is a serious risk that a joint trial would either compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence. See Zafiro v. United States, 506 U.S. 534, 539, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993). A defendant seeking severance must show that the prejudice to him from joinder is sufficiently severe to outweigh the judicial economy that would be realized by avoiding multiple lengthy trials. See United States v. Panza, 750 F.2d 1141, 1149 (2d Cir. 1984) . . . .
>
> Rule 14 does not require severance, even if prejudice is shown. See Zafiro, 506 U.S. at 538–39, 113 S.Ct. at 937–38. The rule leaves the type of relief granted to the sound discretion of the trial court. See id. . . . As the Supreme Court has recognized, limiting instructions are often sufficient to cure any risk of prejudice. See id. at 539 . . . .

United States v. Walker, 142 F.3d 103, 110 (2d Cir. 1998).  The Second Circuit has made clear that "[f]or reasons of economy, convenience, and avoidance of delay, there is a preference in the

federal system for providing defendants who are indicted together with joint trials." United States v. Feyrer, 333 F.3d 110, 114 (2d Cir. 2003) (citation omitted); accord United States v. Yousef, 327 F.3d 56, 149-50 (2d Cir. 2003).  It is well-established that a court typically need not grant a severance where the evidence suggests that the defendants were engaged in a single conspiracy.  See generally United States v. Bernstein, 533 F.2d 775, 789 (2d Cir. 1976); United States v. Sperling, 506 F.2d 1323, 1342 (2d Cir. 1974) ("In view of the more than adequate evidence of the existence of a single conspiracy, the court did not abuse its discretion in denying the motions for severance.").  Finally, the fact that the evidence suggests one defendant was engaged in the criminal wrongdoings to a lesser extent than his co-defendants does not require a court to grant severance.  See United States v. Cohen, 518 F.2d 727, 736 (2d Cir. 1975) ("Although [defendant's] complicity was not as extensive as that of his codefendants, nor his acquisitive rapacity as pervasive as that of his codefendants, we cannot say that a severance of his case was necessary to guarantee him a fair trial [because] [t]he jury could find from all the evidence . . . that there was a single conspiracy . . . and that [defendant] was a principal actor in the activities to advance the conspiracy."); accord United States v. Trippe, 171 F. Supp. 2d 230, 239 (S.D.N.Y. 2001) ("[D]ifferences in degree of guilt and possibly degree of notoriety of defendants do not require that there be separate trials.") (quoting United States v. Aloi, 511 F.2d 585, 598 (2d Cir. 1975) (internal quotation marks omitted)).

Taking Godoy's arguments individually or collectively, Godoy has not shown that his attorney's choice not to move for severance was unreasonable given that it was extremely unlikely that such a motion, had it been made, would have been granted. Godoy argues that he was prejudiced because his and Kassar's defenses were mutually antagonistic, in that the joint trial created the impression that they were partners in the weapons trafficking deal, while in fact,

Godoy "was nothing more than Al Kassar's 'Personal Assistant,' and was not looking at making a single penny from the deal that was allegedly in play."  Pet. Mem. at 59.  However, the fact that co-conspirators have disparate levels of culpability or conspiratorial involvement is not enough to mandate severance of their joint trial.  See Cohen, 518 F.2d at 736.

Godoy contends that had he "been tried separately he could have utilized the lack of predisposition and knowledge defenses standing on the position that he was just an employee acting under the direction of his employer."  Pet. Mem. at 61.  He also states that the joint trial denied him exculpatory evidence because "had the Trials been separate [Kassar] would have certainly testified that he personally told Moreno-Godoy that he had no intention what-so-ever to provide these people any weapons."  Id. at 63.[6]  But these assertions miss the mark because they do not address the fundamental defect in Godoy's argument: that based on the information reasonably available to Stavis, Stavis could properly conclude that a motion for severance would have had little chance of success.

Moreover, in this case Stavis had a legitimate reason to prefer a joint trial.  In a sworn declaration, Stavis explained, "I believed that a joint trial was in [Godoy's] best interests" because it allowed him to argue that "no conspiracy existed because co-defendant, [Kassar] was an intelligence asset for Spain and an un-named third country conducting a 'reverse sting' of the

---

[6] Later in his petition, Godoy makes a similar argument: that the joint trial denied him the chance to question Kassar about certain admissions from Kassar that were introduced by the Government at trial.  See Pet. Mem. at 66-69.  Godoy asserts that this denied him his Sixth Amendment right to confrontation in violation of Bruton v. United States, 391 U.S. 123 (1968).  See Pet. Mem. at 67.  However, there is no basis to find a Bruton violation in these circumstances given that Godoy does not assert that the admissions from Kassar made any reference to Godoy's role in the wrongdoings or even to his existence.  See United States v. Gerry, 515 F.2d 130, 142 (2d Cir. 1975) (rejecting the defendant's Bruton challenge because "[the co-defendant's] admission contained no reference to any other defendant and since the jury was properly instructed that the testimony was received only against [the co-defendant]").

DEA informants."  Declaration of Roger L. Stavis, dated July 31, 2013 (annexed as Ex. A to Gov't Mem.) ("Stavis Decl."), ¶ 5.  In Stavis's view, "[a]bsent a joint trial, [Godoy] would not have been able to join in this 'reverse sting' defense and would have had a much weaker defense to the charges."  Id.  Thus, according to Stavis, his decision not to move for severance was a strategic choice.  In his reply brief, Godoy argues that Stavis would still have been free to present the reverse sting defense in a severed trial.  See Godoy Reply at 26.  But Godoy fails to explain why it would have been preferable to eliminate from trial the very co-defendant who was involved in the "reverse sting," thereby eliminating another attorney who would be forcefully arguing to the jury the same defense.  Given the high deference due to an attorney's decisions under Strickland, we find that Godoy has failed to overcome the "presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  See Bell, 535 U.S. at 698 (quotation marks and citation omitted).

Godoy's arguments also lack logical force.  Godoy relies on Kassar's affidavit, in which Kassar claimed that "[h]ad we been tried separately, or even known that we could be tried separately, I would have certainly Testified [about Godoy's innocence]."  Monzer Al Kassar's Sworn Affidavit, dated Jan. 17, 2013 (annexed as Ex. 5 to Godoy Pet.) ("Kassar Aff."), ¶ 9.  However, in the same affidavit, Kassar stated that the reason why he did not testify on Godoy's behalf was because Kassar's attorney prevented him from doing so, not simply because they had a joint trial.  See id. ¶ 13 ("I wanted to testify at Trial on Mr. Godoy and my own behalf, but Counsel would not let me.").  Thus, the assertions in Kassar's affidavit do not establish that he would have likely testified on Godoy's behalf in the event of a severed trial.  Furthermore, given that Kassar could not have testified on Godoy's behalf without implicating himself, it makes no

sense that Kassar would have testified anyway.[7]

Godoy argues that the joint trial prejudiced him because the jury heard testimony about Kassar's long history of selling weapons to terrorists.  Godoy believes that if the trial had been severed, such evidence would not have been admissible against Godoy because he had only worked for Kassar for the nine years prior to their arrest.  See Pet. Mem. at 65-66.  In Godoy's view, "[w]ithout this evidence it would have been very difficult for the Government to establish Moreno-Godoy's predisposition to commit the fabricated offenses."  Id. at 66.  But Godoy incorrectly assumes that such evidence would not have been admissible against him in a severed trial to prove Godoy's knowledge of Kassar's criminal activities.  See, e.g., United States v. Spinelli, 352 F.3d 48, 55-56 (2d Cir. 2003) (noting that where defendant objected to the admission of co-defendant's "violent and murderous criminal history" at their joint trial, "much of the evidence about [co-defendant's] crimes would have been admissible at a separate trial of [defendant], since it was relevant to proving the nature and scope of the conspiracy in which both were, to differing degrees, involved").  In any event, this argument fails both because counsel acted reasonably in not making the motion to sever and because even if counsel had made it, it likely would not have been granted.  As previously discussed, a court need not grant a severance motion simply because some evidence introduced at a joint trial is not admissible against all of the defendants.  See United States v. Carson, 702 F.2d 351, 367 (2d Cir. 1983) ("[T]he fact that evidence may be admissible against one defendant but not another does not

---

[7] Godoy later argues that "because the Attorney's [sic] did not move for a severance the Jury was not able to hear crucial evidence establishing Moreno-Godoy's actual perspective, and was no ably [sic] to make a reliable determination about his guilt or innocence."  Pet. Mem. at 71.  However, even with the joint trial, Godoy had the option to take the stand and testify on these points or present other testimonial or documentary evidence to support them.

necessarily require a severance.") (citation omitted).  In this case, it is unlikely that Judge Rakoff

would have taken the "drastic" measure of granting a severance.  See Feyrer, 333 F.3d at 114

("[Even] in situations where the risk of prejudice is high . . . less drastic measures — such as

limiting instructions — often suffice as an alternative to granting a Rule 14 severance motion.").

Godoy's argument also fails because it is sheer speculation to assume that the result of a severed

trial would have been different.  See generally United States v. Shareef, 190 F.3d 71, 77-78 (2d

Cir. 1999) (rejecting ineffective assistance of counsel claim because "[petitioner] cannot show

that had his attorney moved for a severance the result would have been different"); United States

v. Holmes, 44 F.3d 1150, 1158-59 (2d Cir. 1995) (rejecting ineffective assistance of counsel

claim because "even if [petitioner's] attorney had moved for a severance, there is no way to

know whether it would have been granted, and even assuming it would have been granted, there

is no way to establish that the result of the trial would have been different").

3.    <u>Ineffective Assistance Regarding the Stipulation</u>

Godoy argues that Stavis was ineffective because he "tricked the Defendant's [sic] into

signing a 'Stipulation' that essentially admitted that they knew the FARC had been designated as

a 'Foreign Terrorist Organization.'"  Pet. Mem. at 72.[8]  To prove that Godoy was guilty of count

four of the indictment, which charged Godoy with conspiracy to provide material support or

---

[8] Godoy alleges that Stavis caused him to "unknowingly sign [a] 'Stipulations' which . . .
amounted to a concession that the Transcripts of the the [sic] Recorded Conversations accurately
reflected the conversations that took place between the Defendant's [sic] and the Informants."
Pet. Mem. at 73.  However, Godoy does not provide any further explanation as to how this was
objectively unreasonable or how it prejudiced him.  In his reply brief, Godoy contends that
Stavis "tricked [Godoy] into agreeing to stipulate to the accuracy [of] the Transcriptions of the
Recorded Conversations . . . to create less work for themselves," see Godoy Reply at 29, but
Godoy provides no evidence to back up this accusation.  Because Godoy has provided no
explanation or evidentiary support for this claim, he has not met his burden of proof to show that
Stavis acted ineffectively.

27

resources to a foreign terrorist organization in violation of 18 U.S.C. § 2339B(a)(1), the Government had to show that Godoy had knowledge that the organization that he transacted with was a "designated terrorist organization" under the statute.  Thus, in Godoy's view, Stavis's decision to stipulate to this fact was objectively unreasonable because "there was an abundance of evidence present in this case establishing that the Defendant's [sic] did not know who exactly who these people were."  See id. at 75.

The stipulation that Godoy and Stavis signed, however, did not address Godoy's knowledge and thus did not prevent him from contesting at trial his knowledge of FARC's terrorist designation.  See Stipulation, dated Nov. 5, 2008 (annexed as Ex. 15 to Godoy Pet.). Instead, the stipulation simply confirmed that "from in or about February 2006 through in or about May 2007, [FARC] was designated by the U.S. Secretary of State as a foreign terrorist organization."  Id.  In other words, the stipulation confirmed the fact only that FARC was a designated terrorist organization, not that Godoy and Kassar had knowledge of this designation. In Stavis's declaration, he states that he "believed it was appropriate to stipulate rather than have a State Department employee testify to such an incontrovertible fact."  See Stavis Decl. ¶ 6. Stavis's decision to stipulate is further validated by the fact that, had he not so stipulated, "the Government would have been permitted to introduce evidence explaining why the FARC was so designated, and, in the process, would have put before the jury testimony and exhibits describing the myriad violent and criminal acts the group has committed."  Gov't Mem. at 31.  Thus, Stavis did not act ineffectively in agreeing to this stipulation.

4.    Failing to Move to Exclude the Recorded Conversations

Godoy asserts that the Government introduced into evidence at trial recordings that it had tampered with "to try and hide exculpatory evidence" and that Stavis's "failure to oppose the

28

admission of the Recordings on this bases [sic] constitutes ineffective assistance."  Pet. Mem. at 81.  Godoy states that while at the MCC prior to trial, he was given several CDs containing surveillance recordings that the Government intended to introduce against Godoy at his trial.  Id. at 79.  Over the course of the sting operation, the Government informants had secretly taped incriminating conversations that implicated the defendants in the illicit weapons deal.  Id.  Upon review of these recordings, Godoy allegedly discovered certain differences between two recordings that purported to be of the same conversation.  Id.  Believing that this constituted proof that the recordings had been tampered with by the Government to remove exculpatory statements, Godoy contacted Stavis and asked him to look into the problem.  See Godoy's Letter to Stavis, dated May 22, 2008 (annexed as Ex. 10 to Godoy Pet.).  In Godoy's view, when he informed Stavis about the "clearly altered" recordings, Stavis "d[id] nothing about it" and in fact "'Stipulated' with the Government that the accuracy of the Translation [of the recordings] was good."  Id. at 81.  Thus, Godoy argues that Stavis provided ineffective assistance of counsel because "it was inexcusable for [Stavis] to let [the recordings] get admitted without objection, and even worse, stipulate to their accuracy."  Id. at 82.

In response, the Government argues that Godoy's claim that the Government deliberately tampered with the recordings to remove exculpatory statements "belies logic and common sense" because "[i]f the Government had indeed altered one of the recordings in order to delete exculpatory information, it would be illogical for it to have simultaneously introduced a second recording of the same conversation into evidence."  Gov't Mem. at 32.  Additionally, given that at least one of the recordings that the Government introduced into evidence contained the whole, unedited conversation, Godoy "cannot show the necessary prejudice to satisfy Strickland's second prong, that but-for counsel's failure to object to the admission of the recording, the trial's

outcome would have been different."  Id. at 33.

   As an initial matter, we note that Godoy has presented no non-conclusory evidence to support his claim that the Government deliberately doctored the audio recordings to remove exculpatory evidence.  Godoy has produced the transcripts of two of the recordings, N-44 and N-45, which consist of the same conversation held between the defendants and the Government informants during the sting operation.  In Godoy's assessment, because these recordings are of the same exact conversation and because there are minor discrepancies between the transcripts for these recordings, this shows that the Government must have deliberately altered the recordings in some way.  See Pet. Mem. at 79.  The transcripts indeed reflect minor differences. For example, the transcript of recording N-44 contains the phrase "Más los del gobierno, pero es que hay un problema, que los paramilitares están agarrando el control de mucho sembradíos y laboratorios" while the transcript of recording N-45 contains, at the same location, the slightly different phrase "Más los... pero ...pero está allí el problema, que los paramilitares están agarrando el control de muchos sembradíos y laboratorios."  See Transcript of Audio Recordings N-44, dated Mar. 26, 2007 (annexed as Ex. 28 to Godoy Pet.) ("N-44 Aud. Rec. Trans."), at 98; Transcript of Audio Recordings N-45, dated Mar. 27, 2007 (annexed as Ex. 27 to Godoy Pet.) ("N-45 Aud. Rec. Trans."), at 99.  However, the fact that there are slight differences between the two transcripts does not suggest that the Government deliberately tampered with the recordings. Indeed, as Godoy acknowledges, N-44 and N-45 may have been recordings of the same conversation that were taped by two different informants, Samir and Carlos.  See Pet. Mem. at 80-81.  Thus, it is possible that the minor discrepancies between N-44 and N-45 are simply the result of differing levels of interference (such as static), or otherwise different degrees of the quality of the recordings.  Based on the record presented by Godoy, there would have been no

reason for Stavis to file any motion or to refuse to stipulate to the accuracy of the transcripts.

Furthermore, the only evidence that Godoy has proffered on this point undermines his ultimate conclusion. Godoy has attached as an exhibit to his petition a letter written by Paul Ginsberg, an expert in the field of electronic surveillance and tape-recordings, in which Ginsberg gave his opinion on the recordings after he forensically examined them for signs of tampering. See Letter from Paul Ginsberg, dated Jan. 5, 2009 (annexed as Ex. 11 to Godoy Pet.) ("Ginsberg Letter"); see also Professional Audio Labs Website Page (annexed as Ex. 11 to Godoy Pet.) (stating that "Mr. Ginsberg is recognized as one of the leading experts in the field of electronic surveillance and tape-recordings" and "has rendered expert testimony on more than 170 occasions"). Based on his review of the recordings, Ginsberg assessed that "[s]everal discontinuities and irregularities were observed. After some investigation it was determined that they were introduced by the Government in packing DVD's to their capacity, complete with fractional files that were continued on the subsequent DVD, unplayable because supporting files were missing." Ginsberg Letter at 2. Far from indicating that the Government deliberately removed exculpatory evidence from the recordings, Ginsberg's assessment instead suggests that the "irregularities" were a technical consequence of the Government's transfer of the recordings to DVDs. This assessment is further supported by Stavis's declaration in which he recalled that, when he contacted Ginsberg to look at the recordings, his "review of the recordings . . . proved inconclusive." See Stavis Decl. ¶ 7.

Godoy argues that in N-44 — the recording that appears to contain the entire conversation — the Government deliberately altered certain words during the transcription process. Specifically, Godoy argues that when the Government transcribed the aforementioned section of recording N-44, it intentionally changed the word "compañero" to "gobierno." See

31

Pet. Mem. at 80-81.  In Godoy's view, if the transcript correctly contained the word

"compañero," this would have indicated that Godoy had the innocent belief that the FARC was a

part of the Colombian government and was not a terrorist group.  Id. at 80.  However, Godoy has

presented no evidence showing that the Government tampered with this recording to remove this

allegedly exculpatory statement.  The only "proof" that Godoy has mustered on this point is that

on the copy of the N-44 transcript that he has introduced as an exhibit, he appears to have

crossed out the word "gobierno" and written "compañero" above it.  See N-44 Aud. Rec. Trans.

at 98.  Additionally, on the N-45 transcript, Godoy has added the word "compañero" and written

"This is the truth" at the top of page.  See N-45 Aud. Rec. Trans. at 99.  Where, as in this case,

the petitioner's bare assertion of fact is directly contradicted by the plain language of other

evidence in the record, we need not accept the factual allegation.  See Puglisi, 586 F.3d at 214

("[A] district court need not assume the credibility of factual assertions, as it would in civil

cases, where the assertions are contradicted by the record in the underlying proceeding.").

Indeed, we find no indication in the record that the Government deliberately excised or altered

this or any other part of the recordings.  Additionally, we note that prior to trial Godoy himself

agreed to a stipulation stating that the transcribers "fairly and accurately transcribe[d] and

interpret[ed] the Spanish language spoken by the participants in the conversation on the

corresponding Compact Discs."  See Stipulation to Accuracy of Transcriptions and Translations

of Recordings, signed Nov. 5, 2008 (annexed as Ex. 15 to Godoy Pet.), ¶ 3.  Accordingly,

because any argument by Stavis premised on the allegation that the Government deliberately

altered the recordings or the transcripts of the recordings in order to hide exculpatory evidence

would have entirely lacked foundation, we find that Stavis did not behave unreasonably in

choosing not to raise such an argument.

32

Godoy makes the related argument that Stavis should have moved to exclude the recordings on the grounds that the recordings contained "discontinuities and irregularities," thus rendering such recordings inadmissible under the Federal Rules of Evidence.  See Pet. Mem. at 86-88.  But there mere fact that there are "discontinuities and irregularities" does not necessarily mean that the recordings would have been found inadmissible.  While the Federal Rules of Evidence have as a "principal objective" the exclusion of unreliable evidence," see United States v. Scheffer, 523 U.S. 303, 309 (1998), and that the Rule of Completeness "requir[es] generally that adversaries be allowed to prevent omissions that render matters in evidence misleading," see Baker v. Goldman Sachs & Co., 669 F.3d 105, 111 (2d Cir. 2012), there is nevertheless "a clear preference for the admission of recordings notwithstanding some ambiguity or inaudibility, as long as the recordings are probative," United States v. Arango-Correa, 851 F.2d 54, 58 (2d Cir. 1988).  Indeed, under Second Circuit precedent, "[t]he mere fact that some portions of a tape recording are inaudible does not by itself require exclusion of the tape" and generally the recording is admissible "[u]nless the unintelligible portions are so substantial as to render the recording as a whole untrustworthy."  Id. (quoting United States v. Bryant, 480 F.2d 785, 790 (2d Cir. 1973)); accord United States v. Malachowski, 604 F. Supp. 2d 512, 518 (N.D.N.Y. 2009) (where defendant moved to exclude the Government's audio recordings of conversations between defendant and an informant because certain "exculpatory statements made by himself [could not] be heard clearly within a number of the Government's recordings" the court nonetheless admitted the recordings because their probative value outweighed any danger of unfair prejudice).  In this case, although Godoy has pointed out a line in one of the recording transcripts that appears to be missing certain words, he has not shown that Stavis acted unreasonably in choosing not to seek exclusion of the evidence.

Even assuming <u>arguendo</u> that a reasonable attorney would have made the motion, Godoy has not shown that a court would have been likely to exclude the tapes or transcripts at trial. Additionally, even if the incomplete audio recording (N-45) had been excluded for containing too many omissions and lacking sufficient trustworthiness, the complete recording (N-44) could have been introduced into evidence in the place of the N-45 recording, thus eliminating any potential prejudice entirely.

"[A]s an afterthought," Godoy alleges that Stavis was also ineffective for failing to oppose the admission of "portions of the [recorded] conversations where Moreno-Godoy is talking to the Informants about the color of Cocaine being similar to sugar" on grounds of "Unfair Prejudice, Surplussage, and Irrelvance [sic]."  Pet. Mem. at 92.  This claim is based on a faulty premise because Stavis in fact opposed the introduction of this evidence at trial.  When a Government informant was asked to testify about Godoy's cocaine and sugar statement, Stavis objected and asked for a side bar to discuss the motion in limine that he had made regarding this issue.  <u>See</u> Tr. 728.  Stavis argued to Judge Rakoff that Godoy's statements should be excluded "on a rule 403 basis," because "the prejudice of making this into a drug conspiracy that didn't otherwise exist is overwhelming."  Tr. 729-30.

### 5.   Failing to Call Witnesses at Godoy's Trial

Godoy claims that Stavis provided ineffective assistance because he chose not to call certain witnesses to testify at the trial.  Godoy argues that Stavis should have hired Paul Ginsberg to testify about the unreliability of the Government recordings.  In Godoy's view, "had [Ginsberg] got on the stand and testified that there were in fact several 'discontinuities and irregularities' with the Recordings as he states in his letter . . . the Recordings would have been completely discredited in the eyes of the jury."  Pet. Mem. at 91.  Godoy contends that Stavis did

not call Ginsberg as a witness because of a "lack of diligence, and a dispute over the charged fees." Id. at 90.

Similarly, Godoy asserts that Stavis did not secure a "Weapons System and Defense Technology Expert" named George S. Sevier because he "did not want to pay the requested fee." Id. at 94. Godoy points to a letter that Sevier wrote to Kassar's attorney in which Sevier stated, "I thought that your client and his associates were more likely to be running a scam against their 'customer' than involved in actually delivering the material." See Expert Sevier Letter, dated Oct. 13, 2008 (annexed as Ex. 12 to Godoy Pet.) ("Sevier Letter"). In Godoy's view, this letter establishes that Sevier would have provided crucial testimony at the trial to support the defendants' "position that the Defendant's [sic] never intended to sell the FARC weapons — and were therefore not guilty of the charged crimes." Pet. Mem. at 95. Godoy alleges that he was denied Sevier's testimony because Stavis "let a small billing disagreement get in the way of providing [his] clients a meaningful defense." Id. at 97.

Later in his petition, Godoy argues that Stavis should have also called James Soiles, the DEA agent who allegedly convinced the Government to initiate the sting operation, to testify so that Godoy could show "the Malicious/Vindictiveness of Agent Soiles and the U.S. Government . . . which in turn would have severely discredited the Government's case at chief and made the Trial Defense much more believable." See id. at 112. Specifically, Godoy alleges that if his attorney had called Soiles to testify, he could have shown the jury that the Government's sting operation was simply retaliation for the "failed Achille Lauro Trial." See id. at 112-13. Godoy alleges that the reason why Stavis did not call Soiles to testify was because he was "just trying to get out of the case doing as little work as possible while collecting an enormous fee." Id. at 114.

The Second Circuit has held that "[t]he decision not to call a particular witness is

typically a question of trial strategy that [reviewing] courts are ill-suited to second-guess," and

thus, "counsel's decision as to whether to call specific witnesses — even ones that might offer

exculpatory evidence — is ordinarily not viewed as a lapse in professional representation."

Greiner v. Wells, 417 F.3d 305, 323 (2d Cir. 2005) (quotation marks and citations omitted); see

also United States ex rel. Walker v. Henderson, 492 F.2d 1311, 1314 (2d Cir. 1974) (stating

"courts will practically never second-guess" an attorney's "decision to call or bypass particular

witnesses").

Applying this standard, we conclude that Godoy has failed to show that Stavis's decision

not to call these potential witnesses was an unreasonable trial strategy.  While Godoy conjectures

that Stavis's decision was motivated by a desire not to pay Ginsberg and Sevier expert fees or to

not have to spend time preparing to question Soiles, Godoy offers no factual support for these

contentions beyond supposition.   Moreover, it would have been reasonable for Stavis to decide

that the testimony of these potential witnesses would not have been helpful to Godoy's case.

Sevier's opinion would not have been admissible given that Federal Rule of Evidence 704 bars

an expert witness in a criminal case from "stat[ing] an opinion about whether the defendant did

or did not have a mental state or condition that constitutes an element of the crime charged or a

defense."  Thus, Sevier would not have been permitted to testify that the defendants only

intended to con the FARC agents and did not in fact have the required intent to sell the weapons.

Similarly, although Godoy contends that Ginsberg would have entirely discredited the

Government's recordings, in fact, the record shows that Ginsberg believed only that the

recordings had slight technical inaccuracies due to their transfer to the DVDs.  See Ginsberg

Letter at 2.  Additionally, given the fact that some of the recordings appeared to be relatively

unaltered, such as recording N-44, Ginsberg's testimony would not have significantly discredited

the Government's evidence.  Finally, with respect to the decision not to call Soiles, Stavis explained in his sworn declaration that he was "very reluctant to inject into this trial the Achille Lauro terrorist attack during which and [sic] elderly man was murdered by being thrown overboard in his wheel chair."  Stavis Decl. ¶ 10.  In other words, the potential benefit that could have been gained from Soiles taking the stand would have likely been outweighed by Soiles' likely testimony concerning Kassar's alleged past wrongdoings.  This is exactly the type of strategic decision by counsel that deserves deference.  For these reasons, we find that Stavis's decision not to call these witnesses was not objectively unreasonable.

Godoy also contends that Stavis was ineffective for denying Godoy the chance to testify at the trial on his own behalf.  Godoy states as follows: "Why Counsel failed to call Moreno-Godoy remains a mystery.  Attorney Stavis had told him prior and during Trial that he would have his chance to tell his side of the story to the jury . . . But the Attorney's [sic] never called [Godoy]."  Id. at 102.  Godoy summarizes what he would have testified about had he taken the stand and explains how the absence of this testimony prejudiced his case.  See id. at 102-09. Godoy concludes this point by asserting, "[Stavis] in the instant case, not only failed to call Moreno-Godoy resulting in ineffective assistance, but also failed to inform him that it was his [Right] to Testify and that he could do so regardless of Counsel's opinion."  Id. at 111.  To support this claim, Godoy has cited only to his own affidavit in which he contends simply, "I told Counsel prior and during Trial that I wanted to testify on my own behalf, but Counsel never called me."  Luis Moreno-Godoy's Sworn Affidavit in Support or Request for 28 USC §2255 Relief, dated Jan. 15, 2013 (annexed as Ex. 8 to Godoy Pet.) ("Godoy Aff."), ¶ 7.  In response to Godoy's allegations, Stavis has stated the following:

With regard to Petitioner's claim that I prevented him from testifying at trial, this is

37

untrue.  It was Petitioner's decision not to testify.  He based his decision on my recommendation . . . It had been our operating assumption that due to a variety of factors, including his genial nature and lack of any criminal history, Petitioner was likely to testify at trial.  Toward the conclusion of the trial I met with Petitioner over the weekend to prepare him for his testimony . . . At this meeting I not only went through his proposed testimony but also possible cross examination questions.  During this weekend prep session, it became apparent that Petitioner could not withstand cross-examination.  In particular I recall that he was unable to provide credible answers to cross-examination questions concerning his conversations with the informants about a possible cocaine transaction . . . Moreover, the "reverse sting" defense had been introduced to great effect through our Spanish intelligence witnesses and recorded conversations . . . such that Petitioner's testimony was unnecessary to establish our defense.  In light of these factors, I recommended to Petitioner that he not testify at trial.  Petitioner accepted my recommendation and agreed not to testify.  The actual decision was his and not mine.

Stavis Decl. ¶ 9.

While petitioner and counsel have presented two versions of what occurred between them, we do not find it necessary to hold a testimonial hearing to adjudicate this claim.  The Second Circuit concluded as much when faced with an even more detailed assertion of a similar character from the petitioner in Chang, 250 F.3d 79.  In Chang, the petitioner asserted that "his trial counsel prohibited him from testifying, [and] did not at any time apprise him that the ultimate decision whether to testify or not was his to make," averring that "had he known at the time of trial that counsel could not stop him from testifying, he would have done so," id. at 81 (internal punctuation omitted).  The court in Chang began by recognizing:

A defendant in a criminal case has the right to testify on his own behalf. See Rock v. Arkansas, 483 U.S. 44, 49, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). We have held that the right to testify is "personal" and, therefore, can be waived only by the defendant. Brown v. Artuz, 124 F.3d 73, 77 (2d Cir.1997). Thus, "regardless of strategic considerations that his lawyer concludes weigh against such a decision," id., a defendant who wishes to testify must be permitted to do so.

250 F.3d at 82-83.  Nevertheless, the court found that it was not necessary for the district court to hold a testimonial hearing on this issue because it "reasonably decided that the testimony of [the petitioner] and his trial counsel would add little or nothing to the written submissions."  Id. at 86.

38

In other words, the district court had the discretion to decide the issue on the basis of the petitioner's and his counsel's written submissions in circumstances where "[the petitioner] bore the burden of proving his claim[,] [h]is proffer involved a generic claim — one that can be, and is often, made in any case in which the defendant fails to testify — based solely on his own highly self-serving and improbable assertions[,] [and] [t]rial counsel's detailed description of events was eminently credible." Id.

      As was true in Chang, we find it unnecessary to conduct a testimonial hearing on Godoy's claim that Stavis prevented him from exercising his right to testify on his own behalf. Godoy has not supplied any evidence, other than his own affidavit, in support of this allegation. Whereas Godoy's affidavit is brief, generic and self-serving on this point, Stavis's is detailed, thorough, and credible. Stavis not only acknowledged that it was his and Godoy's original intention to have Godoy testify but also explained why they changed their minds on this issue once the trial had begun. See Stavis Decl. ¶ 9. Moreover, Godoy's affidavit is not actually inconsistent with Stavis's explanation. All that Godoy alleges in his affidavit is that "I told Counsel prior and during Trial that I wanted to testify on my own behalf, but Counsel never called me." Godoy Aff. ¶ 7. In other words, the two statements can be reconciled if at some point during the trial that Godoy wanted to testify but that by the time the decision had to he made, he changed his mind. At no point in his affidavit does Godoy state that Stavis actually prevented him from testifying or that Stavis misled him into thinking that it was his and not Godoy's decision as to whether he would testify. In contrast to Godoy's lack of detail on this issue, Stavis unequivocally stated in his declaration that "[i]t was [Godoy's] decision not to testify." Stavis Decl. ¶ 9.

      In sum, we find that Stavis did not prevent Godoy from testifying at the trial, and

therefore, any ineffective assistance claim premised on this assertion must be denied.

6.  Failing to Properly Cross-Examine and Impeach Government Witnesses

Godoy also suggests that Stavis provided ineffective assistance because he failed to ask the Government's key witnesses certain questions that would have "impeached their testimony, discredited the Government's entire case, and would have provided a more accurate evidentiary picture for the jury." Pet. Mem. at 115. First, Godoy argues that Stavis should have impeached DEA Agent John Archer about his Grand Jury testimony to the effect that Godoy handled all of Kassar's financial matters because "Archer had absolutely no proof supporting this allegation as it was a direct lie presented [to] the Grand Jury to intentionally create the impression that [Godoy] knew everything about [Kassar] and played a larger role in the instant case than the evidence actually establishes." Id. at 116. Godoy asserts that Stavis should have also questioned Archer about the Government's recordings because "Archer had a History of tampering and planting evidence from when he was stationed in Las Vegas." Id. at 117.

Godoy argues that Stavis should have questioned Government informants Carlos and Samir about the accuracy of the recordings that they had made during the sting operation. In Godoy's view, if Stavis had asked Carlos about why his recording was different from Samir's, "[t]his would have shown the jury that the Government's case was not credible, and that the Recordings should not be given much weight if any." Id. at 120. Godoy also believes that Stavis should have asked Carlos whether Godoy "actually ever agreed, hypothetically or otherwise, to do a drug deal with them" because "the Jury relied on the incorrect assumption that Moreno-Godoy was really engaged in an on the side drug deal with the FARC." Id. at 122. Additionally, Godoy alleges that Stavis could have established a better sentencing manipulation defense if Stavis had "question[ed] Carlos about why they added the Missile request towards the

40

end of the Sting." Id. at 123.  With respect to Samir, Godoy states that Stavis should have asked

him about his involvement in the Government's operation against Kassar from 2003 to 2005 to

help show "a pattern on the U.S. Government's part of wrongly accusing Al Kassar of crimes he

did no convict [sic]." Id. at 125.

Godoy contends that Stavis should have cross-examined Romanian police inspector

Claudio Cucu about the Romanian police department's involvement in the arrest of Godoy.  See

id. at 129.  Specifically, Godoy believes that the fact that the Romanian police department did

not provide all of its records pertaining to Godoy in the discovery process "creates a substantial

inference that somebody is trying to hide something." Id. at 130.  Finally, Godoy claims that

Stavis was ineffective for failing to ask the Government's weapons expert, Andreas Morgner,

whether "he knew if the Missile System in the diagram that Al Kassar showed the Informants

had ever actually been manufactured for sale" because he would likely have answered "that he

was unable to find any information, despite his diligence, that the system in question was [ever]

Manufactured for sale, or is currently available on any known Market." Id. at 131-32.  In

Godoy's view, this would have helped demonstrate that Kassar "never intended to provide these

people with Missiles" and that he was in fact conducting a "Double Reverse Sting." Id. at 133.

As is true for a defense counsel's decision as to which witnesses to call, "[d]ecisions

about whether to engage in cross-examination, and if so to what extent and in what manner, are

strategic in nature and generally will not support an ineffective assistance claim." See Dunham,

313 F.3d at 732 (citation and internal punctuation omitted).  Accordingly, "the conduct of

examination and cross-examination is entrusted to the judgment of the lawyer, and [a reviewing

court] on a cold record should not second-guess such decisions unless there is no strategic or

tactical justification for the course taken." See United States v. Luciano, 158 F.3d 655, 660 (2d

Cir. 1998) (citing <u>United States v. Eisen</u>, 974 F.2d 246, 265 (2d Cir. 1992) (no ineffective

assistance despite defendant's claim that lawyer had failed to thoroughly impeach prosecution

witnesses because decisions as to nature and extent of cross-examination are strategic)).

 As an initial matter, many of the questions that Stavis allegedly failed to ask on cross-

examination would have been collateral, if not entirely irrelevant, to the case.  For example,

although Stavis could have tried to impeach Archer by asking him about the statements he made

at the Grand Jury proceeding, he could not have introduced extrinsic evidence to demonstrate the

statements' falsehood, given that they were collateral to any issue in the case.  <u>See</u> <u>generally</u> Fed.

R. Evid. 608(b); <u>United States Purdy</u>, 144 F.3d 241, 245-46 (2d Cir. 1998) ("Extrinsic evidence

offered for impeachment on a collateral issue is properly excluded.") (citing cases).

Furthermore, any argument pertaining to Godoy's belief that the Government or its agents

deliberately tampered with the recordings is not supported by any actual evidence, and therefore,

any questions on this point would have made the defendant look like he was grasping for straws,

thereby undercutting the effectiveness of other cross-examination.  Additionally, given Godoy's

lack of evidence that the Government engaged in vindictive prosecution or sentencing

manipulation, Godoy's assertion that Stavis would have uncovered such insidious motives

through cross-examination is speculative and therefore insufficient to show that Stavis either

acted unreasonably or that any failure to ask such questions prejudiced Godoy.  Similarly, the

inferences that Godoy has drawn regarding the answers that Romanian inspector Cucu and

weapons expert Morgner would have given are entirely speculative and thus also fail to support

any claim of ineffective assistance of counsel.

 Notably, as the Government points out, "defense counsel vigorously cross-examined the

Government's witnesses, particularly Special Agent Archer . . . Carlos . . . and Samir . . . with

questioning spanning hundreds of pages of trial transcript."  Gov't Mem. at 39.  For example,

defense counsel cross-examined Agent Archer about the following topics: that the informants

involved in the sting operation were being paid by the Government, Tr. 588-90; that in an

investigation in 2000 Archer may have tampered with and even destroyed certain evidence,

Tr. 527-28; that Archer instructed the informants about what to tell defendants with regard to the

sting operation, Tr. 603; and that it was not until later in the investigation that he instructed the

informants to bring up the request to buy missiles, Tr. 605.  When questioning the Government

informants, defense counsel suggested to the jury that the Government's recordings might not be

entirely accurate by asking Carlos about whether he ever had any difficulty with the recording

system, Tr. 874-75, eventually insinuating that Carlos might have erased certain conversations

with defendants, Tr. 931.  Defense counsel also cross-examined Carlos about the substance of

his conversations with defendants – for example, questioning whether Kassar ever specifically

agreed to sell them missiles.  Tr. 924.  Similarly, defense counsel questioned Samir about the

fact that he was being paid by the Government for his assistance in the sting operation, Tr. 1046;

that Samir had signed a cooperation agreement with the DEA in return for a reduced prison

sentence, Tr. 1048-49, and about the substance of certain conversations with the defendants,

Tr. 1078-79.   Additionally, defense counsel attempted to elicit testimony from these

Government witnesses to support the "reverse sting operation" defense.  Tr. 1079-80.

Accordingly, we do not find fault with Stavis's efforts at cross-examination.

### 7.       Failure to Raise Certain Arguments on Appeal

Godoy challenges Stavis's performance on appeal on the ground that Stavis should have

argued that Godoy's conviction violated Due Process because "the Due Process Clause requires

that before Agents of the United States can run a 'Sting' on Foreign Soil that they first obtain

Documented Credible Proof (Probable Cause) that the target has been engaged in at least similar conduct in recent times."  Pet. Mem. at 135.  Godoy acknowledges that "this issue would have been a matter of first impression for the Court's [sic]" but nonetheless asserts that it "would have quite likely resulted in a more favorable, and quite reasonable legal analysis by the Court."  Id. at 136.  In Godoy's view, had Stavis made this novel legal argument, the Supreme Court might have used Godoy's case to establish this new Due Process requirement.  Id. at 137.  Godoy faults Stavis because instead of making this novel legal argument, Stavis asserted on appeal that "the United States lacked jurisdiction in this case because the 'Sting' did not fall within the reach of the Statutes charged, and because the Defendant's [sic] never set foot, intended to set foot, or Conspired to commit a crime within the Territories of the United States.  Id. at 134.  In Godoy's view, Stavis should not have made this argument because it was "arguably foreclosed by existing precedent."  Id.

The Strickland test applies to claims that appellate counsel was ineffective.  See Smith v. Robbins, 528 U.S. 259, 285 (2000).  To prevail on such a claim, a petitioner must prove "both that (1) appellate counsel acted objectively unreasonable in failing to raise a particular issue on appeal, and (2) absent counsel's deficient performance, there was a reasonable probability that defendant's appeal would have been successful . . . ."  Larrea v. Bennett, 2002 WL 1173564, at *18 (S.D.N.Y. May 31, 2002) (citing Robbins, 528 U.S. at 285) (additional citations omitted), adopted, 2002 WL 1808211 (S.D.N.Y. Aug. 6, 2002), aff'd, 368 F.3d 179 (2d Cir. 2004).  One of the main functions of appellate counsel, however, is to "winnow[] out weaker arguments on appeal."  Jones v. Barnes, 463 U.S. 745, 751 (1983).  As a result, appellate counsel is not required to present every nonfrivolous claim on behalf of a defendant appealing his or her conviction.  Robbins, 528 U.S. at 288 ("[A]ppellate counsel who files a merits brief need not

44

(and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal.") (citation omitted).  As a consequence, "[i]n attempting to demonstrate that appellate counsel's failure to raise a . . . claim constitutes deficient performance, it is not sufficient for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument . . . ."  Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994) (citing Barnes, 463 U.S. at 754).  Rather, a petitioner must show that appellate counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker."  Id.; accord Clark v. Stinson, 214 F.3d 315, 322 (2d Cir. 2000).

> On appeal, Godoy and his co-defendants made the following arguments:
>
> [I] The government lacked jurisdiction to prosecute because of an insufficient nexus between their actions and the United States.  [II] The government's investigation constituted "outrageous conduct" in violation of their due process rights.  [III] The district court erred in denying their motion to introduce exculpatory classified evidence.  [IV] The convictions under 18 U.S.C. § 2332g (acquiring and exporting SAMs) must be overturned because: the statute does not criminalize conspiracy; the jury was improperly instructed as to scienter; the defendants' actions fall under the statute's exception for authorized conduct; and there was insufficient evidence of conspiracy.  [V] Convictions under 18 U.S.C. § 2339B (aiding a known terrorist organization) must be overturned because: the statute requires that the aid be intended to support the illegal activities of the terrorist organization, or, in the alternative, the statute violates the Fifth Amendment's Due Process Clause by not requiring such intent.

Al Kassar, 660 F.3d at 117.  To prove that Stavis provided ineffective assistance during the appeals process, Godoy must show that the arguments that Stavis asserted in Godoy's appeal were "clearly and significantly weaker" than the "significant and obvious" Due Process argument that Godoy believes Stavis should have raised.

Here, there has been no such showing.  Instead, Godoy simply asserts that "there can be no question that 'Procedural Safeguards' need to be put in place here to protect otherwise innocent people and the usurption [sic] of powers," and that "it is a safe bet that the Supreme

Court will eventually have to set forth some kind of 'Procedural Safeguard' to draw some kind of line in the dirt, and protect the Constitution."  Pet. Mem. at 136.  Plainly, Godoy's "Procedural Safeguards" argument was not "significant and obvious."  Godoy himself concedes that it was a matter of "first impression."  Nor were the arguments Stavis did assert "significantly weaker" than the one Godoy proposes.  Thus, Godoy has not shown Stavis's ineffectiveness on appeal.  See generally Anderson v. United States, 393 F.3d 749, 754 (8th Cir. 2005) (finding that counsel's failure to assert on appeal "a wholly novel claim" did "not render his performance constitutionally ineffective" because the Constitution "does not insure that defense counsel will recognize and raise every conceivable constitutional claim") (citation and quotation marks omitted); accord Alberto-Suarez v. United States, 2005 WL 1538197, at *4 (S.D.N.Y. June 29, 2005) ("Counsel cannot be ineffective by failing to object to a non-existent violation, and failure to object under such circumstances is certainly not unreasonable 'under prevailing professional norms' as required by Strickland.").

8.    Failing to Make Distinct Arguments for Godoy

Godoy argues that Stavis provided ineffective assistance because Stavis should have argued both during the trial and on appeal that "Godoy had no reason to disbelieve Al Kassar when he told him that he had no intention to provide these people with [any] weapons once they switched up their story, and that he was just trying to obtain as much information as possible to turn over to his Spanish Intelligence Contacts so they could be arrested."  Pet. Mem. at 144. Godoy further contends that "[t]he focus should have been on what Moreno-Godoy's perspective was considering his lack of Criminal History and Knowledge of Al Kassar's distant past, in conjunction with the things that he had personally witnessed during the time of his employment for Al Kassar."  Id. at 145.  Godoy alleges that, on appeal, "Stavis argue[d] one position from a

46

joint perspective and [did] not distinguish the two different Defendant's [sic] point of view, which was extremely important as to the question of guilt . . . [because] Godoy did not have the same perspective (understanding) or predisposition to commit the charged crimes as Al Kassar." Id. at 146.  Accordingly, we consider whether, under the Strickland standard, Stavis provided ineffective assistance by failing to raise these arguments either during the trial or on appeal.[9]

In reviewing trial counsel's decisions, we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Strickland, 466 U.S. at 689.  Given this deference afforded to counsel's strategic decisions, a petitioner bears a high burden in proving that counsel was ineffective for failing to raise certain arguments at trial.  See United States v. Alli-Balogun, 72 F.3d 9, 11 (2d Cir. 1995) (rejecting defendant's ineffective assistance claim premised on counsel's failure to raise a certain argument at trial because defendant produced no evidence that this additional argument would have been persuasive or that it would have led to a different result); United States v. Porcelli, 865 F.2d 1352, 1366 (2d Cir. 1989) (refusing to second-guess counsel's decision to advance certain arguments at trial and not raise others).  Similarly, as discussed in the previous section, courts should not "second-guess reasonable professional judgments and impose on counsel a duty to raise every colorable claim on appeal."  Jackson, 162 F.3d at 85 (quoting Jones, 463 U.S. at 754) (internal punctuation omitted); see also Cuoco v. United States, 208 F.3d 27, 32 (2d Cir. 2000) ("To prove ineffective assistance of appellate counsel, it is not sufficient for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument, for counsel does not have a duty to advance every nonfrivolous argument that could be made.") (citation and quotation marks

---

[9]  To the extent that Godoy is arguing that he was denied conflict-free representation by Stavis, we discuss this issue in section III.B below.

omitted).

Here, we have no reason to second-guess Stavis's strategic decisions as to how he presented Godoy's defense.  As explained in his declaration, Stavis believed that Godoy's strongest defense at trial was to argue that "no conspiracy existed because [Kassar] was an intelligence asset for Spain and an un-named third country conducting a 'reverse sting' of the DEA informants."  Stavis Decl. ¶ 5.  This strategy was reflected in Stavis's opening statement in which he told the jury,

> I would submit to you that there was never a conspiracy between these highly-paid informants, my client, Mr. Moreno Godoy, and Mr. Al Kassar.  There was never an agreement.  There was never a meeting of the minds.  There was an attempt to find out who these guys were, and when ultimately Mr. Al Kassar had the goods, he packed them in his briefcase and went to meet Commissioner Castano in Madrid, but he was arrested before then.

Tr. 307.  In support of this argument, Stavis and Kassar's counsel presented two Spanish intelligence agents as defense witnesses and "introduced testimony as well as their contemporaneous recorded conversations with Al Kassar, which reflected Al Kassar's efforts to secure the arrests of the informants claiming to represent the FARC terrorist group."  Stavis Decl. ¶ 5.  At the same time, defense counsel vigorously attempted to discredit the Government's key witnesses by establishing that DEA Agent Archer had engaged in evidence tampering in the past, Tr. 527-28, and that the Government informants had been highly paid for their services in executing the sting operation, Tr. 588-90.  Thus, it is apparent that Stavis had a consistent, cogent, and reasonable strategy throughout the course of the trial.  Instead of arguing, as Godoy contends he should have, that Godoy was oblivious to the true nature of the weapons deal — an argument that would likely have been overwhelmed by the copious evidence to the contrary — Stavis argued and introduced evidence to support the defense that Godoy and Kassar were

working with Spanish authorities to catch suspects who tried to buy weapons for illegal purposes.

While Godoy suggests in his reply brief that Stavis could have presented both arguments to the jury, see Godoy Reply at 26, it is doubtful that they would have been effective if presented together.  Certainly, we cannot say that it was an unreasonable strategic choice to only argue the reverse sting defense.  Stavis could reasonably have believed that presenting both arguments would have confused the jury or that one argument might have undermined the other.  Indeed, Stavis made such an assessment in deciding which arguments to include in his appellate brief. Stavis explains in his sworn declaration: "[a]s an attorney who has argued well over 100 appeals in various state and federal courts, I do not subscribe to the philosophy of raising as many claims as possible on appeal.  This tends to obscure the strongest appellate claims.  My practice is to choose for the final brief only the strongest appellate claims out of all of those raised at trial and researched."  Stavis Decl. ¶ 15.  Thus, we find that Godoy has failed to show that Stavis behaved objectively unreasonably in choosing not argue Godoy's "unique perspective" during trial or in deciding to prioritize other arguments on appeal.

9.    Failing to Allow Godoy to Hire a New Attorney on Appeal

Godoy claims that Stavis prevented him from hiring a new attorney to handle his appeal. See Pet. Mem. at 137-43.  While Godoy discusses at great length the circumstances surrounding this issue, we only briefly summarize the relevant facts given that we find there to be no legal basis for Godoy's claim.  When Godoy asked Stavis to find a "fresh set of eyes" to help the defense team argue Godoy and Kassar's appeal, Stavis contacted an attorney named Steven R. Kartagener to help out with the case.  Id. at 137.  The defendants then signed a retainer agreement with defense counsel, agreeing to pay Stavis $125,000, Kartagener $100,000, and

49

Kassar's lead counsel Ira Sorkin $100,000 for collectively handling the defendants' appeal.  Id. at 137-38.  About a year later, defendants discovered that Kartagener could no longer work on their appeal because the Government did not clear him to access classified information under the Classified Information Procedures Act.  Id. at 138.  In Godoy's words, at that point "it was to [sic] late to seek yet another Attorney and Stavis seized this opportunity to make (or steal) another $100,000 by going to Kartagener and taking the $100,000."  Id.  Godoy alleges that Stavis perpetrated a fraud upon Godoy in order to receive an additional $100,000 for handling the appeal and to prevent any other attorney from representing Godoy.  Godoy concludes that as a result of these events, he "ended up with ineffective assistance on appeal, and [was] denied [his] Right to Attorney of Choice because [he was] forced to stick with Stavis or be out several hundred thousand dollars and miss their 'Appeal Brief Deadline.'"  Id. at 141.

Godoy relies on United States v. Gonzalez-Lopez, 548 U.S. 140 (2006), to argue that "once it is established that the Defendant's [sic] Sixth Amendment Right to paid Counsel of Choice [is] violated, no further showing of prejudice is necessary because the error was structural in nature."  Pet. Mem. at 142.  Godoy reasons that because "Stavis denied him of his Fundamental Right to his Attorney of Choice by purposefully, and negligently, waiting until the last minute to tell [Godoy] that Kartagener was not cleared under CIPA," relief should be granted without having to show that this action prejudiced him in any way.  See id. at 142-43.

We reject Godoy's analysis because he has not shown any violation of his Sixth Amendment right to counsel.  The Constitution guarantees a defendant only "a fair opportunity to secure counsel of his own choice."  Powell v. Alabama, 287 U.S. 45, 53 (1932).  There is no guarantee that the effort to obtain a particular counsel will be successful.  Godoy might have a claim if he could show that the Government interfered in some manner with his ability to obtain

50

counsel.  See, e.g., United States v. Stein, 541 F.3d 130, 154 (2d Cir. 2008) ("[T]he right to counsel in an adversarial legal system would mean little if defense counsel could be controlled by the government or vetoed without good reason.").  But Godoy does not allege that his deprivation of choice of counsel was the result of any improper Government conduct.  Instead, he contends that he was unable to choose his own attorney because of Stavis's conduct.  See Pet. Mem. at 141.  Because Stavis is a private actor and Godoy has not alleged nor has he made any showing that there was any "nexus of state action" between Stavis and the Government, see Stein, 541 F.3d at 147, Godoy cannot make out a Sixth Amendment violation.

    Nor has Godoy made out an ineffective assistance claim based on these allegations. Most obviously, Stavis acted reasonably with respect to the arguments that he chose to raise on appeal and thus Godoy did not receive ineffective assistance of counsel regardless of what fee arrangements were made.  Additionally, there is no basis for finding that Godoy was prejudiced by Stavis's purported conduct in arranging to be Godoy's appellate counsel to the exclusion of other counsel because Godoy cannot show that the outcome of his appeal would have been different with other counsel.

    Further, Stavis vigorously denies Godoy's allegations.  Stavis asserts that after Godoy was convicted, he met with Godoy and Kassar and "indicated to both that they should appeal and that it was only natural that they would want different attorneys for the appeal."  Stavis Decl. ¶ 13.  Stavis states that at first Kartagener was going to represent Godoy on the appeal, but when it was discovered that Kartagener would not receive a security clearance to handle Godoy's case, Stavis "volunteered to replace Kartagener as [Godoy's] appellate counsel."  Id. ¶ 14.  Stavis allegedly wrote a letter to Godoy stating, "I thought it is preferable for me to be your lawyer because I know the case; already have a security clearance; and can file the brief

51

quickly so you don't lose any more time.  Of course, if you wish we can find you another appellate attorney or you can apply to the court for one to be appointed.  This is entirely your choice."  Id.  Stavis states that Godoy then agreed to have him represent his appeal and "was very pleased to have [Stavis] as his appellate counsel."  Id.  Much like Godoy's contention that Stavis prohibited him from testifying on his own behalf, Godoy has provided no reliable evidence for his claim that he did not wish at that time for Stavis to be his appellate counsel.  Stavis, by contrast, has rebutted Godoy's allegations by providing a detailed account of what he asserts actually happened regarding the decision to hire a new attorney to handle Godoy's appeal.

### 10.   Cumulative Impact of Counsel's Alleged Shortcomings

Godoy's final ineffective assistance of counsel claim is that "the cumulative effect of Counsel's errors amounts to the constructive denial of counsel altogether."  See Pet. Mem. at 153.  This argument is rejected inasmuch as we found that none of Godoy's claims of ineffective assistance have any merit whatsoever.  Considering Godoy's claims cumulatively does not change this analysis.  See, e.g., United States v. Wu, 2009 WL 3053741, at *4 n. 4 (S.D.N.Y. Sept. 17, 2009) ("Since none of [petitioner's] claims has the slightest merit, his [cumulative impact] claim . . . adds nothing to his argument."); Porter v. United States, 2008 WL 5451011, at *1 n. 1 (E.D.N.Y. Dec. 31, 2008) ("[B]ecause petitioner has failed to establish that there were, in fact, errors at his trial . . . petitioner's 'cumulative effect' arguments have no basis in fact and fail as a matter of law.").

### B.   Sixth Amendment Conflict of Interest Claim

Godoy argues that "counsel violated [Godoy's] Sixth Amendment right to conflict-free representation by focusing their efforts on Al Kassar and in the process denied Moreno-Godoy of

available and meaningful defenses to the charged crime." Pet. Mem. at 147. Godoy contends

that "although Stavis was Moreno-Godoy's primary Attorney and Sorkin was Al Kassar's, all

Motions and objections were jointly filed, and the entire defense centered around Al Kassar and

what was best for him. This is due to the fact that Al Kassar's family was the one who paid all

of the Attorney fees." Id. at 148. Additionally, Godoy asserts "that at no time did he make a

knowing and intelligent waiver of his Right to Conflict Free Representation as he could have

never known prior to Trial that his Attorney's [sic] would not adequately represent him during

the Trial or Direct Appeal Proceedings." Id. at 148-49. Godoy states that as "a layman of the

law, who could not understand a word of english [sic] at the time, [he] could not have possibly

'knowingly' and 'intelligently' waived his right to conflict free representation. It was not

reasonably foreseeable to him that he would be denied of meaningful defenses to the crimes

charged due to joint representation." Id. at 150; see also Godoy Reply at 85. Godoy believes

that Stavis had an "actual conflict of interest" that was not waivable because "Al Kassar's family

paid all of the legal expenses and for that reason the Attorney's [sic] loyalties were for Al Kassar

first and Moreno-Godoy second." Pet. Mem. at 151.

The law governing claims of ineffective assistance of counsel based on an alleged

conflict of interest has been summarized by the Second Circuit as follows:

> "A defendant's Sixth Amendment right to effective assistance of counsel includes
> the right to representation by conflict-free counsel." United States v. Blau, 159
> F.3d 68, 74 (2d Cir.1998). In the absence of a conflict of interest, a defendant
> claiming ineffective assistance of counsel must demonstrate that the lawyer's
> representation "fell below an objective standard of reasonableness," Strickland v.
> Washington, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and
> that counsel's deficiency was "prejudicial" to the defense, id. at 692, 104 S.Ct.
> 2052. However, "[p]rejudice is presumed . . . if the defendant demonstrates that
> counsel 'actively represented conflicting interests' and that 'an actual conflict of
> interest adversely affected his lawyer's performance.' [Cuyler v. Sullivan, 446
> U.S. 335, 350, 348 (1980)] (footnote omitted)." Id. These components are

considered in a single, integrated inquiry. "[T]he [Cuyler v.] Sullivan standard is not properly read as requiring inquiry into actual conflict as something separate and apart from adverse effect. An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." Mickens v. Taylor, 535 U.S. 162, 172 n. 5, 122 S.Ct. 1237, 152 L. Ed. 2d 291 (2002) . . . .

Eisemann v. Herbert, 401 F.3d 102, 107 (2d Cir. 2005) (some alterations in original).

The Second Circuit has identified "three particular kinds of counsel-client conflicts: per se conflicts, actual conflicts, and potential conflicts." Ventry v. United States, 539 F.3d 102, 111 (2d Cir. 2008).

Per se conflicts are so severe that they are deemed per se violations of the Sixth Amendment. Such violations are unwaivable and do not require a showing that the defendant was prejudiced by his representation. Actual conflicts occur when the interests of a defendant and his attorney diverge with respect to a material factual or legal issue or to a course of action and violate the Sixth Amendment when counsel's representation of the client is adversely affected by the existence of the conflict. Potential conflicts exist if the interests of the defendant may place the attorney under inconsistent duties at some time in the future and violate the Sixth Amendment when they prejudice the defendant.

Id. (citations and internal punctuation omitted); accord United States v. John Doe No. 1, 272 F.3d 116, 125 (2d Cir. 2001).

"Per se conflicts" are limited "to two instances: (1) where trial counsel is not authorized to practice law or (2) where counsel is implicated in the crime for which the defendant is on trial," John Doe No. 1, 272 F.3d at 125 – neither of which is applicable here. An "actual conflict" is "a conflict of interest that adversely affects counsel's performance." Mickens v. Taylor, 535 U.S. 162, 172 n.5 (2002). For there to be an "actual conflict[,]" however, there must be a divergence of interests with respect to a "material factual or legal issue or to a course of action." Ventry, 539 F.3d at 111 ; accord United States  v. Jones, 482 F.3d 60, 75 (2d Cir. 2006) (no "actual" conflict of interest where claim was merely that client and attorney disagreed on

54

legal tactics and strategy).  And even where there is an actual conflict of interest demonstrated, relief is not available unless the defendant shows that "some plausible alternative defense strategy or tactic might have been pursued, and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests."  <u>Eisemann</u>, 401 F.3d at 107 (internal quotation marks and citations omitted); <u>accord</u> <u>Feyrer</u>, 333 F.3d at 116 (conflict must have caused "an actual lapse in representation") (citations omitted). Here, there was no actual conflict of interest or even a potential conflict of interest.

As already discussed, Judge Rakoff held a <u>Curcio</u> hearing prior to trial that addressed the question of whether any conflict existed and whether any conflict had been waived.  At that hearing, Judge Rakoff thoroughly questioned Stavis and Ghazi's counsel, Marc Agnifilo, about the possibility that Kassar's payment of their attorney's fees would create a conflict of interest. <u>See</u> C. Hr. 13-17, 20-23.  Stavis explained at the hearing that when he first met with Godoy, he told Godoy that Kassar's "people" had brought them together and that "Kassar or his people associated with him would be paying a legal fee, so that [Godoy] . . . would not have to pay fees."  C. Hr. 21.  At that same meeting, Stavis told Godoy that "it wouldn't matter that Mr. Al Kassar or people associated with him were responsible for the fees, but that my loyalty would only run to [Godoy] and I wouldn't do anything to damage him in order to please Mr. Al Kassar."  C. Hr. 21-22.  At the hearing, Stavis read a portion of Godoy's retainer agreement, which stated, "it is anticipated that the retainer may be paid by a third party or parties.  In that event, you agree and understand that no attorney-client relationship will be established between any third party, and this law firm . . . you will be this firm's only client and will have our complete loyalty with regard to this matter."  C. Hr. 22.  Stavis stated that Godoy had been provided with a Spanish translation of this agreement.  <u>Id.</u>  Stavis also described another meeting

in which he explained to Godoy "the fact that who pays the fee has no impact and that [his] loyalty runs to him, and that whatever he did in the case would be only in his best interests." Id. Stavis informed Judge Rakoff that his attorney's fees for representing Godoy had already been paid in full so that "there was no financial string . . . that Mr. Al Kassar held over the matter." C. Hr. 23.  Based on these representations, Judge Rakoff stated: "I am totally satisfied that there is neither an actual nor even a potential conflict." C. Hr. 26.  He explained, "the entire funding of each of these representations was taken up front . . . [s]o that there is no moneys that will be coming directly or indirectly from Mr. Al Kassar to these attorneys in the future . . . [and] there is no economic disincentive to these defendants or their counsel taking any position adverse to Mr. Al Kassar." Id.

Based on this evidence, Stavis's representation of Godoy did not create even a potential conflict of interest.  A conflict of interest can arise where a third party's payment of a defendant's attorney's fees leads to a "theoretical division of loyalties." See, e.g., United States v. Wells, 394 F.3d 725, 733 (9th Cir. 2005); see also In re Grand Jury Subpoena Served Upon Doe, 781 F.2d 238, 248 n. 6 (2d Cir. 1986) ("Accepting payment of clients' fees from a third party may subject an attorney to undesirable outside influence, particularly where the attorney is representing clients in criminal matters.") (citing Model Rules of Professional Conduct, Rule 1.7).  But there was no "division of loyalties" in Stavis's case.  Because Stavis received all of his attorney's fees from Kassar at the beginning of his representation of Godoy, his advocacy for Godoy could not have resulted in any financial retribution from Kassar.  Thus, it could not be argued that Stavis was financially beholden to Kassar.  Indeed, as Judge Rakoff put it, "there is no incentive for defense counsel to represent, even a subconscious pressure so to speak for defense counsel to represent anyone's interests but his client's." C. Hr. 20.  While Godoy

contends that Stavis's disloyalty was demonstrated by his decision not to move to sever the joint trial and not to argue more vigorously that Godoy had no knowledge of Kassar's alleged misdeeds, we have already explained why these decisions were justified by strategic considerations.  Given that we can find no financial incentive or any other reason why Stavis might have wanted to advance Kassar's interest at Godoy's expense, there was no actual or potential conflict of interest in Stavis's representation of Godoy.

Even if there had been a conflict of interest, however, Godoy waived the conflict at the Curcio hearing.  "Where the right to counsel of one's choice conflicts with the right to an attorney of undivided loyalty, the determination of which right is to take precedence must generally be left to the defendant, who may make a knowing and intelligent waiver of his right to a conflict-free lawyer if he desires to continue the representation."  United States v. Cain, 671 F.3d 271, 293 (2d Cir. 2012) (citing Curcio, 694 F.2d at 24-25).  In order to ensure that a defendant's waiver is knowing and intelligent, a hearing is generally held, as was the case here, in which the trial court:

> 1) advises the defendant of his right to representation by an attorney who has no conflict of interest, (2) instructs the defendant as to the dangers arising from particular conflicts, (3) permits the defendant to confer with his chosen counsel, (4) encourages the defendant to seek advice from independent counsel, (5) allows a reasonable time for the defendant to make a decision, and (6) determines, preferably by means of questions that are likely to be answered in narrative form, whether the defendant understands the risk of representation by his present counsel and freely chooses to run them.

United States v. Perez, 325 F.3d 115, 119 (2d Cir. 2003) (citation omitted).  "Where an actual or potential conflict has been validly waived, the waiver cannot be defeated simply because the conflict subsequently affects counsel's performance; such a result would eviscerate the very purpose of obtaining the waiver."  United States v. Schwarz, 283 F.3d 76, 95 (2d Cir. 2002).

Here, there is ample evidence demonstrating that, to the extent that any potential conflict existed, it was knowingly and intelligently waived by Godoy at the <u>Curcio</u> hearing on April 10, 2008.  Godoy makes three arguments as to why his waiver could not have been knowing and intelligent: because he "could not understand a word of english [sic] at the time," because he was a "layman of the law," and because "[i]t was not reasonably foreseeable to him that he would be denied of meaningful defense to the crimes charged due to joint representation."  Pet. Mem. at 150.  None of these carry weight.  First, Godoy was assisted by a Spanish interpreter at all times during the <u>Curcio</u> hearing.  C. Hr. 1.  There is no indication in the hearing record that Godoy had any difficulty understanding the questions that Judge Rakoff asked him.  Second, the waiver process is explicitly geared to defendants who have no knowledge of the law.  Thus, Godoy was not unique in this respect.  Judge Rakoff took the necessary precautions to ensure that Godoy sufficiently understood his situation, asking numerous questions in response to which Godoy indicated that he understood the fee arrangement and any potential for conflict based on the fact that Kassar had paid his fees.  C. Hr. 23-25.  After Judge Rakoff questioned Godoy and Ghazi at the hearing, he concluded that "each of these defendants, both of whom are very intelligent, fully understands the entire situation and recognizes that, if there were even the slightest conflict, they should bring it to the attention fo the Court."  C. Hr. 26.  Additionally, Godoy's former appointed counsel, Jennifer Brown, was made available to Godoy "for future consultation" if Godoy had any concerns about the possibility that Stavis had a conflict of interest.  C. Hr. 10.

Finally, we reject Godoy's assertion that it was not foreseeable to him "that he would be denied of meaningful defense to the crimes charged due to joint representation."  Pet. Mem. at 150.  The factual predicate for this assertion – that he was denied a meaningful defense – is

unsupported by any evidence in the record.  Moreover, Judge Rakoff advised Godoy that if he had any future concerns about a conflict, he would have the opportunity to bring them to the attention of the Court.  C. Hr. 26.  Godoy never expressed to Judge Rakoff any concern that Stavis was being disloyal to him or was putting Kassar's interests ahead of his own.

For these reasons, we reject Godoy's claim that his conviction should be reversed because he was denied conflict-free representation in violation of the Sixth Amendment.

C.    Godoy's Remaining Claims

Godoy asserts several claims unrelated to his counsel's performance that he argues we should address despite the fact that he did not raise them on direct appeal.  The claims are that "the Government violated the Petitioner's substantial rights by purposefully hindering his ability to assist in his own defense," see Pet. Mem. at 159-65; "the Government violated the Petitioner's substantial rights, and perpetrated a fraud upon the United State's [sic] Grand Jury and both the Spain and Romanian Court's [sic] by providing them with information in support of indictment and extradition that was not true and lacked indicia of reliability," see id. at 165-68; and "the Government violated the Petitioner's substantial rights . . . by altering the recorded conversations and tailoring the transcribed versions to remove exculpatory and impeachment evidence, and change the context of the conversations in their favor," see id. at 168-70.

A section 2255 motion "is an extraordinary remedy and will not be allowed to do service for an appeal."  Bousley v. United States, 523 U.S. 614, 621 (1998) (quotation marks omitted).  Thus, "[i]n general, a defendant is barred from collaterally challenging a conviction under § 2255 on a ground that he failed to raise on direct appeal."  United States v. Thorn, 659 F.3d 227, 231 (2d Cir. 2011) (internal quotation marks and citations omitted); accord Zhang v. United States, 506 F.3d 162, 166 (2d Cir. 2007); see also Marone v. United States, 10 F.3d 65, 67 (2d

59

Cir. 1993) ("A § 2555 petition may not be used as a substitute for direct appeal.") (citation omitted). This rule does not apply, however, when "the defendant establishes (1) cause for the procedural default and ensuing prejudice or (2) actual innocence." Thorn, 659 F.3d at 231 (citing Bousley, 523 U.S. at 622).

          1.     Godoy's Actual Innocence Claim

To succeed on a claim of "actual innocence," a petitioner must show that, "in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." Fountain v. United States, 357 F.3d 250, 255 (2d Cir. 2004) (internal citations omitted). "To be credible," an actual innocence claim "requires petitioner to support his allegations of constitutional error with new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial." Schlup v. Delo, 513 U.S. 298, 324 (1995). "'New Evidence' in § 2255 proceedings . . . is evidence that is discovered after the original hearing, and which could not, with due diligence of counsel, have been discovered sooner." Giacalone v. United States, 739 F.2d 40, 43 (2d Cir. 1984) (citation omitted); accord Rosario-Dominguez v. United States, 353 F. Supp. 2d 500, 510 (S.D.N.Y. 2005) (same). Additionally, the "new evidence" must be "material, not cumulative, and probably lead to an acquittal." Moreno-Ortiz v. United States, 983 F.2d 15, 16 (2d Cir. 1993) (citation and internal punctuation omitted); accord United States v. Sahabir, 880 F. Supp. 2d 377, 381 (N.D.N.Y. 2012) (same). An "actual innocence" claim "does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty." Schlup, 513 U.S. at 329.

Godoy argues that "'New Evidence' that was not heard by this Court, the Jury, or the Appeals Court due to Constitutional error establishes that he is 'actually innocent' of the crimes

he has been convicted of."  Pet. Mem. at 154.  Godoy alleges the following "new evidence": "(1) Al Kassar's Sworn Testimony establishing that as far as Moreno-Godoy knew he was not going to provide the weapons and was instead was intending on turning the buyers in to the authorities . . . ; (2) Moreno-Godoy's Testimony that Al Kassar had told him that he had no intention in providing these people with the requested weapons and was going to have them arrested by his Spanish Intelligence Contacts . . . ; (3) Retired Airforce Colonel (Sevier's) projected Testimony and Written Report indicating that despite his diligence he was unable to find any evidence that the Missile System that Al Kassar showed the Informants had ever been manufactured and that it was his opinion that the Codefendant's [sic] had no intention in actually providing the requested weapons . . . ; and (4) The Audio Expert (Ginsberg's) Written Report indicating that there was evidence that the Audio Recordings had been tampered with."  Id. at 155-56.  Godoy claims that "had it not been for the aforementioned Constitutional Violations imposed upon him by and through Defense Counsel and the Government, that the Jury and both the Court's [sic] would have been able to consider all of the aforementioned evidence, and that after they had done so [Godoy] would not stand convicted of the charges and be serving a 25-year sentence."  Id. at 156.

Godoy's actual innocence claim fails because he has provided no explanation why the pieces of evidence he lists constitute "new evidence" under the governing standard.  As previously mentioned, new evidence consists only of "evidence that is discovered after the original hearing, and which could not, with due diligence of counsel, have been discovered sooner."  Giacalone, 739 F.2d at 43 (citation omitted).  There is no indication that any of the pieces of evidence that Godoy lists was not available to Godoy or his counsel prior to his trial.  Although Godoy now asserts that he was unjustifiably prevented from introducing any of this

evidence at trial, Godoy has shown no basis for that assertion either.  Indeed, as we noted, we have found that Godoy made the decision not to testify on his own behalf.  And while Godoy and Stavis did not end up hiring Sevier or Ginsberg to testify, they had the ability to do so.  In any event, even if Stavis had improperly not arranged for these expert witnesses to testify, Godoy nevertheless is unable to show that the evidence they would have provided was "discovered after the original hearing."  See Ginsberg Letter; Sevier Letter.

Although Kassar's testimony may indeed have been out of Godoy's reach at trial, this too does not constitute the type of "new evidence" that can be used to establish actual innocence.  Courts have consistently found that affidavits submitted by co-defendants or co-conspirators do not constitute "new evidence," at least where the information contained within the affidavits was known to the defendant at the time of trial.  See, e.g., Sahabir, 880 F. Supp. 2d at 382-83 (finding that affidavits from petitioner's co-conspirators did not constitute "new evidence" because petitioner failed to show that this evidence could not have been discovered prior to trial); United States v. Yarmoluk, 993 F. Supp. 206, 208 (S.D.N.Y. 1998) (finding that "affidavits of others involved in petitioner's scheme" did not constitute "new evidence in terms of § 2255"); Tropiano v. United States, 323 F. Supp. 964, 966 (D. Conn. 1971) (for the purpose of § 2255 petition, "Petitioner's proffered testimony by co-defendant . . . does not qualify as newly discovered evidence").  Godoy's petition is conspicuously devoid of any contention that Kassar's knowledge of what Godoy purportedly knew is something Godoy learned after trial.

It would not help Godoy to argue that Kassar's testimony was not "available" to Godoy at trial because Kassar exercised his Fifth Amendment right not to testify at trial.  Case law is clear that a co-defendant's testimony in this situation is not considered newly discovered evidence.  See Monsanto v. United States, 2000 WL 1206744, at *3 (S.D.N.Y. Aug 24, 2000) (in

62

addressing § 2255 petitioner's actual innocence claim, acknowledging that "virtually every court to have addressed this issue has found that testimony offered by a co-defendant who exercised his Fifth Amendment privilege at trial cannot be characterized as 'newly discovered'") (citing cases); United States v. Washington, 653 F.3d 1057, 1065 (9th Cir. 2011) (finding that habeas petitioner's "co-defendants' recent desire to exculpate [petitioner] does not qualify as 'newly discovered' evidence"); Mercado-Ulloa v. United States, 2007 WL 777690, at *12 (W.D. Wash. Mar. 13, 2007) (finding that for petitioner's § 2255 petition, co-defendant's exculpatory statement "does not qualify as 'newly discovered evidence'" despite the fact that co-defendant "chose not to testify at trial"); cf. United States v. Owen, 500 F.3d 83, 89 (2d Cir. 2007) (where defendant asserted that co-defendants' exculpatory statements constituted "newly discovered evidence" for purpose of Rule 33 motion for a new trial, the court "join[ed] the majority of circuits to have addressed the issue and [held] that Rule 33 does not authorize district courts to grant new trials on the basis of such evidence since it is not newly discovered, but merely newly available"); United States v. Jacobs, 475 F.2d 270, 286 n. 33 (2d Cir. 1973) (asserting that "a court must exercise great caution in considering evidence to be 'newly discovered' when it existed all along and was unavailable only because a co-defendant, since convicted, had availed himself of his privilege not to testify").

Moreover, even if Kassar's testimony did qualify as "newly discovered evidence," it would not be sufficient to establish by the "more likely than not" standard that "no reasonable juror would have convicted him in light of the new evidence." Dunham, 313 F.3d at 730 (citation omitted). To the extent that Kassar would have been allowed to testify about Godoy's purported lack of knowledge, it is extremely unlikely that a reasonable jury would have afforded such testimony weight given the contrary testimony provided by the Government informants and

63

the Government recordings that show Godoy's involvement in Kassar's illicit dealings.

For these reasons, Godoy has failed to demonstrate "actual innocence." Thus, he cannot overcome the procedural default on these grounds.

2.      Cause for Default

Notwithstanding his failure to show actual innocence, Godoy can still overcome the procedural default of his substantive claims if he can "establish both cause for an earlier default and actual prejudice from the errors challenged." Campino v. United States, 968 F.2d 187, 189 (2d Cir. 1992) (citation omitted). In order to establish "cause" for the default, the petitioner must show that "'some objective factor external to the defense impeded counsel's efforts' to raise the claim at an earlier proceeding." Bloomer v. United States, 162 F.3d 187, 191 (2d Cir. 1998) (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)); accord United States v. Ortiz, 2013 WL 3863888, at *3 (S.D.N.Y. July 25, 2013).

Here, Godoy provides no reasonable explanation for why he could not have raised on direct appeal the four substantive claims he lists in his § 2255 petition. Although Godoy contends that the "Government's Campaign to make it as difficult as possible to mount meaningful defenses" continued during the direct appeal stage, he does not identify any specific roadblocks that prevented him from asserting any of the claims. See Pet. Mem. at 163. Godoy mentions that the Government prevented him from corresponding with Kassar by way of the prison's electronic mail service, see id. at 163-64, but this does not explain why Godoy or his attorney were unable to raise these claims on appeal. Indeed, at no point does Godoy suggest the during the appeals process that he and his attorney lacked the necessary knowledge or evidence to assert the claims.

Godoy once again places blame on Stavis, stating that he "failed to raise [the] important

issues in the Direct Appeal." Id. at 164.  However, it is well-established that "attorney ignorance

or inadvertence is not cause because the attorney is the petitioner's agent when acting, or failing

to act, in furtherance of the litigation, and the petitioner must bear the risk of attorney error."

Marone, 10 F.3d at 67 (citation and internal punctuation omitted).  Thus, in the absence of any

evidence suggesting that the Government or some other external force prevented Godoy from

raising these specific claims on appeal, Godoy has failed to show the necessary "cause" to

excuse his procedural default.[10]

IV.     CONCLUSION

For the foregoing reasons, Godoy's motion to vacate his conviction should be denied.

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties have fourteen (14) days including weekends and holidays from service of

this Report and Recommendation to serve and file any objections.  See also Fed. R. Civ. P. 6(a),

(b), (d).  Such objections (and any responses to objections) shall be filed with the Clerk of the

Court, with copies sent to the Hon. Jed Rakoff, 500 Pearl Street, New York, New York 10007.

---

[10]  Godoy perfunctorily states in his petition, "the petitioner just adds that he was represented by the same Attorney on Appeal as he was during the Trial Proceedings, but to the extent that the Court or the Government would find that the petitioner defaulted by not raising this Claim in either the District Court or on Appeal, than [sic] the petitioner asserts herein that Counsel was also ineffective for failing to raise this Claim during the appropriate time."  Pet Mem. at 168, 170.  Any such ineffective assistance claims are not listed among the 19 claims in his petition and are not discussed in his 171-page petition or 114-page reply.  In other words, Godoy provides no explanation of why it was objectively unreasonable for Stavis to fail to raise the four substantive claims or how this failure caused Godoy prejudice.  In light of the lack of explanation to support these claims, we reject any purported claim of ineffective assistance of counsel. Nor is any explanation needed at this point because it is plain that the issues Godoy argues should have been raised were not "significant and obvious" issues that were stronger than the claims actually raised by appellate counsel.

Any request for an extension of time to file objections must be directed to Judge Rakoff.  If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated:  March 20, 2014
        New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copy sent to:

Luis Felipe Moreno-Godoy
60461-054
FCI Talladega
PMB 1000
565 East Renfroe Road
Talladega, AL 35160

Counsel by ECF